UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

**DOUGLAS B STALLEY, As P.R. of
the Estate of Jose Gregory Villegas and
obo ZV and DV, minor children of the
deceased,**

       **Plaintiff,**

**v.**                                               **Case No: 5:19-cv-280-JSM-PRL**

**SHEILA CUMBIE, FLORIDA
DEPARTMENT OF CORRECTIONS,
MILTON GASS, ANTHONY KEY,
HENRY FENDER, SCOTT AKE,
ANILDAT AMRIT, BRENT
MCBRIDE, WILLIAM SMITH,
DALTON TIFFT, ALAN PERROTTA,
DONALD FOSTER, JAMES DISANO,
SHAWN LEE and MICHAEL
MASHBURN,**

       **Defendants.**

_____

### REPORT AND RECOMMENDATION[1]

On March 28, 2017, at the Lake Correctional Institution, corrections officers discovered inmate Jose Gregory Villegas unresponsive in his cell. Within the hour, Villegas was dead. The events that transpired in the interim, including the use of force by the officers in allegedly attempting to restrain him and their actions (and inactions) regarding obtaining medical care for him, are the basis of Plaintiff's claims in this case.

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. See Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B). A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1.

Douglas Stalley, as Personal Representative of the Estate of Jose Villegas, brings this suit on behalf of the estate and Villegas's minor children and alleges the following claims in the Second Amended Complaint (Doc. 26): (Count I) negligence under Florida's Wrongful Death Act, against the Florida Department of Corrections (FDOC) and Warden Sheila Cumbie; (Count II) a violation of Villegas's civil rights under 42 U.S.C. § 1983 for excessive use of force, against Lt. Milton Gass, Sgts. Anthony Key, Henry Fender, Scott Ake, and Anildat Amrit, and Corrections Officers Brent McBride, William Smith, Dalton Tifft, Alan Perrotta, and Donald Foster; (Count III) a violation of Villegas's civil rights under 42 U.S.C. § 1983 for the deliberate indifference to his serious medical needs, against the same individual defendants sued in Count II; and (Count IV) a violation of Villegas's civil rights under 42 U.S.C. § 1983 under a theory of supervisory liability against Lt. Milton Gass, Captain James Disano, Major Shawn Lee, and Assistant Warden Michael Mashburn.

The FDOC and Defendants Cumbie,[2] Gass, Key, Fender, Ake, Amrit,[3] McBride, Smith, Tifft, Perrota, Foster, Disano and Lee have moved for summary judgment as to each of the claims brought against them (Doc. 61), Plaintiff has responded (Doc. 73), and they have replied (Doc. 81). Defendant Mashburn has separately moved for summary judgment as to Plaintiff's supervisory liability claim (Doc. 62), Plaintiff has responded (Doc. 74), and

---

[2] As discussed below, Plaintiff does not oppose the motion for summary judgment as it relates to Warden Sheila Cumbie in her official capacity in Count I.

[3] As Plaintiff notes in footnote 9 of Plaintiff's response in opposition to Defendants' motion for summary judgment (Doc. 73 at 31), "Plaintiffs do not oppose Defendant Anildat Amrit's Motion for Summary Judgment only." Amrit is named as a defendant in Count II (excessive force under § 1983) and Count III (deliberate indifference under § 1983). While Plaintiff does not say expressly whether his non-opposition applies to both claims in which Amrit is named, that appears to be the case, as Amrit is not mentioned in the heading of the argument on page 31 (regarding the excessive force claim) nor the heading of the argument on page 35 (regarding the deliberate indifference claim). Accordingly, based on Plaintiff's representation, summary judgment is appropriate as to the claims against Amrit.

Mashburn has replied (Doc. 82). As explained below, I submit that, with the exception of the claims on which summary judgment is not opposed and Count IV to the extent it alleges failure to train or enact policies related to K2, factual issues exist that largely preclude summary judgment and, therefore, Defendants' motions should be denied.

## I.   BACKGROUND

At the outset, for the purposes of considering a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party – the Plaintiff here. In arguing a motion for summary judgment, the movants may not rely on their "own factual story." *Patel v. Lanier Cty. Georgia*, 969 F.3d 1173, 1179 n.1 (11th Cir. 2020). Instead, a movant must "accept his opponent's story and convince us that he is nonetheless entitled to prevail as a matter of law." *Id.* In this case, many (though not all) of the relevant facts are largely undisputed and were captured on multiple video recordings. The parties have also provided voluminous exhibits in support of their briefs, including deposition testimony of those involved and other witnesses, such as the medical examiner and Plaintiff's experts. While the record is extensive, the pertinent facts can be summarized.[4]

On March 28, 2017, at about 4:15 p.m., correctional officers at the Lake Correctional Institution (Sgt. Fender, COs Smith and Tifft, and soon after Sgt. Key) responded to a situation in cell 1108 in the E Dorm wing. Another inmate was on top of inmate Jose Villegas, and Villegas was lying on the floor, face up and unresponsive. (Doc. 61, p. 3, Fender Dep., Doc. 50-1 at 26). The defendants note that the other inmate was removed from the cell, and

---

[4] The extensive record includes more than 22 volumes of deposition testimony, as well as voluminous documents. The bulk of the testimony is in the form of depositions of the many FDOC employees involved in this incident, including Perrotta, Amrit, Disano, Ake, Fender, Spencer, Fischer, Key, McBride, Lavezzi, Rosser, Tifft, Foster, Smith, Mashburn and Lee. The focus of this Report and Recommendation, however, is a discussion of the facts viewed in the light most favorable to the non-moving party.

the officers called for additional assistance, medical personnel, and a wheelchair. Two nurses (Paula Fisher and Tammy Spencer) arrived in response with medical equipment and a wheelchair but stayed back awaiting instructions from the officers. The nurses were later instructed by Sgt. Key and CO McBride (who also arrived) to leave the wing. The nurses did not have an opportunity to assess or assist Villegas while he was in the E Dorm. Notably, Sgt. Fender testified that when they found Villegas face up and unresponsive in his cell, he noticed "the strong odor of something burning coming from inside the cell." (Fender Dep., Doc. 50-1 at 26). Further, Sgt. Key testified that he had seen inmates behave violently and erratically while using K2 (synthetic marijuana) and knew that it could affect a person's breathing or heart rate. (Key Dep., Doc. 53-1 at 51).

Meanwhile, while Villegas was on the floor of his cell, face up and unresponsive (he did not respond to commands such as "wake up inmate" and "are you ok inmate"), Sgt. Fender was able to apply hand restraints on Villegas (positioned with his hands on his front) and COs Smith and Tifft applied leg irons to his legs. (Fender Dep., Doc. 50-1 at 43, Key Dep., Doc. 53-1 at 68). He was now restrained – and apparently still on the floor of his cell, unresponsive. At some point, Fender performed a sternum rub (applying pressure to his sternum with his hand or fist) that caused Villegas to respond. According to the testimony of the COs, Villegas (at this point) became agitated and combative. Notably, he's allegedly combative, but also on the ground and restrained at his hands and feet, with four or five officers holding (or attempting to hold) him down.

It is undisputed that the officers then used force to control or further restrain Villegas. As established by their testimony and the video recordings (one of which picks up after the initial contact with Villegas, but while he is still in his cell with the officers using force to

restrain him), the officers' use of force included using their body weight to force and keep Villegas down in a prone position. Indeed, Sgt. Fender and CO Tifft used their body weight to keep him in a prone position while he was groaning and making other noises, and, according to the officers, resisting. Villegas was rolled onto his stomach, the officers can be seen in the video continuing to use their knees to keep him or pin him down, and then later the officers (Sgts. Fender and Key, and COs Tifft, McBride, and Smith) used a five-man carry (as the defendants describe it) or dragged him (as Plaintiff describes it) to move him from his cell to the floor of the day room (which is a more open area just outside his cell).

Nurses Tammy Spencer and Paula Fischer, who had responded to the medical emergency, were waiting in the day room with medical equipment, but were then ordered to leave the day room when Villegas was moved to it. (Fischer Dep., Doc. 51-1 at 64-65). Meanwhile, other officers arrived at the scene, including Lt. Gass, who assumed the duty of Officer in Charge, and CO Perrotta, who immediately used his hands, knee, and body weight, to apply pressure to hold Villegas to the floor. Those responding at this point also included Sgts. Ake and Amrit, and CO Foster. Lt. Gass's supervisor, Major Shawn Lee also responded, as well as Captain James Disano and Assistant Warden Mashburn. Among those present, Lee, Disano and Mashburn were the highest-ranking officers.

As depicted in the videos, while as many as seven officers were simultaneously physically restraining Villegas, still with CO Perrotta's knee in his back to restrain him, the COs applied a spit shield that covered his mouth and used a tether to move his handcuffs from being secured in the front of his body to being secured behind his back. When this was accomplished, the COs announced, "hands on legs on," which (according to the defendants) meant that Villegas was restrained. The videos reveal that the process took some time. As

Defendants represent, "after 22 minutes of resisting . . . Villegas stopped being combative and the use of force upon him ceased." (Doc. 61, p. 10). He was now face down, throwing up, with his legs restrained (as they had been from the early part of the encounter), and his hands retrained behind his back (as opposed to his front – where they had been from the early part of the encounter). No medical care was sought or provided.

Several officers then lifted Villegas into a sitting position against a table where he remained for over a minute, with CO Smith and Tifft appearing (according to Plaintiff) to use their hands to prevent him from falling over. No medical care was sought or provided.

Next, while the defendants contend that several officers (Sgts. Ake and Fender, and COs Foster, McBride, and Perrotta) "helped Villegas stand up and get into the wheelchair," the Plaintiff (whose story is credited here and is supported by the video recording) states that those officers lifted and placed him into the wheelchair, placing his handcuffed arms over the back of the wheelchair (at the direction of Lt. Gass) to prevent him from falling out.

The COs (according to the defendants' version of events) also placed their hands on his shoulders to prevent him from falling out of the wheelchair. Indeed, it's the defendants' position that aside from Lt. Gass's observation that Villegas's breathing was shallow, the other officers (Sgt. Ake, Major Lee, and CO Foster) noted him to be breathing or showing no signs of distress and apparently used their hands to hold him in the wheelchair as part of their normal transportation practice. Officer McBride even placed a new spit shield on him. The officers testify that they placed him in the wheelchair to get to the F Dorm for a medical assessment (which was a few minutes away still), but no medical care was sought or provided before the transport began.

Plaintiff (again, whose story is credited and is supported by the video recording, testimony from some of the officers, the medical examiner, and his experts) contends Villegas was in clear distress. According to Plaintiff, Villegas threw up again when he was placed in the wheelchair, his head remained facedown. Because of the position of his head, his breathing may have been restricted and his airway was not protected, meanwhile the officers were pushing his head down (according to Dr. Hughes), and when he was put in the wheelchair he slouched over. (Hughes Dep., Doc. 77-1 at 65-66). Again, as noted, no medical care was sought or provided at this time.

Notably (and at the risk of being redundant), Villegas was not examined or offered medical care when he was unresponsive in his cell, after he was restrained initially in his cell, after he was restrained again (though this time with his hands behind his back), after he was propped up against the table, or after he was hoisted into the wheelchair. There is evidence that from the beginning there were nurses close by to examine him.[5] But instead after all of those events, he was wheeled to the F Dorm for a medical assessment.

Nurse Fischer, who was there from the initial encounter at E Dorm, even provided testimony (based on both her direct observations and reviewing the video footage) that he was unresponsive and restrained when he was lying prone, when his hands were restrained behind his back, when he was placed into the wheelchair, and when he was wheeled from the E dorm, and that she did not see any safety concerns that would have prevented her from assessing him. (Fischer Dep., Doc. 51-1 at 169-70). Fischer specifically testified that it was

---

[5] Nurse Fischer testified that, after they were instructed to leave, she and Nurse Spencer waited outside E dorm for 10 minutes without knowing what was going on inside. (Fischer Dep., Doc. 51-1 at 23-24). Nurse Fischer testified that when Villegas was wheeled out of the E dorm, he was surrounded by officers and they wouldn't let the nurses near him. (Fisher Dep., Doc. 51-1 at 24). Nurse Fischer attempted to approach Villegas once he was outside, but was told to back away. (Fischer Dep., Doc. 51-1 at 31).

her desire to assess Villegas once he was in the wheelchair and restrained. (Fischer Dep., Doc. 51-1 at 156). Nurse Fischer also testified about her own observation regarding the concerning position of Villegas's head while in the wheelchair because the "bending" position would close off his airway. (Fischer Dep., Doc. 51-1 at 30-31). Nurse Spencer testified that she saw no movement when Villegas was placed in the wheelchair and agreed it would have taken only a few seconds to assess whether he was breathing or had a pulse at that point. (Spencer Dep., Doc. 51-5 at 146-47).

Similarly, Dr. Wendy Lavezzi, Chief Deputy Medical Examiner of Medical Examiner District 5 for Citrus, Hernando, Lake, Marion, and Sumter counties, upon review of the video recording, also noted that Villegas appeared to be unresponsive when he was placed in the wheelchair. Dr. Lavezzi stated, "[h]e doesn't appear to move once he's sat up and put in the wheelchair." (Lavezzi Dep., Doc. 54-1 at 60). And, Dr. Lavezzi specifically testified that once Villegas was "placed in the wheelchair or placed on the floor on his butt," that would have been a good time for the nurses to check his breathing or pulse. (Lavezzi Dep., Doc. 54-1 at 60).

Then, during the transport (which took a few more minutes), while several officers noted his eyes were open and he appeared to be breathing, they also noted his head was down and, according to Officer Ake, about halfway between the E Dorm (where the incident occurred) and F Dorm, his position changed and his head bobbled. (Apparently at about the same time (i.e., halfway to F Dorm), Capt. Disano took over as officer in charge for Lt. Gass.) While they made these observations, no one checked him for a pulse.

According to Lt. Gass, at no point when they were in the E Dorm (so when Villegas was secured, when he was propped up against the table, or when he was placed in the

wheelchair) did Major Lee, Capt. Disano, or Assistant Warden Mashburn, direct any of the officers to complete a medical assessment. And, according to Officer Smith, they never even instructed the officers to evaluate whether Villegas had a pulse (and, as noted above, they didn't).

Upon his arrival at F Dorm (13:12 on Handheld video 1 according to defendants) he was examined by the nurses and had no pulse and was not breathing. About two minutes later (based on the handheld time of 15:40) CPR was started. Once CPR was initiated, it continued until Lake County Emergency Medical Services arrived and took over. Villegas was transported to South Lake Hospital where he was pronounced dead.

In the autopsy report, Dr. Lavezzi, Chief Deputy Medical Examiner, made the following determinations: "CAUSE OF DEATH: Restraint Asphyxia; CONTRIBUTING CONDITION: Excited Delirium; MANNER OF DEATH: Homicide." (Doc. 54-4 at 1). Dr. Lavezzi explained in her deposition that, while not a legal definition, for the purposes of her report, "homicide" meant "death as a result of an intentional act of another human being." (Lavezzi Dep., Doc. 54-1 at 26).

Interestingly, Capt. Disano (one of the three superiors at the scene in E Dorm) testified that if everything is occurring according to policy, then a superior wouldn't take over. Disano stated that either he, Major Lee or Asst. Warden Mashburn would have had the authority to take over as the office in charge of the use of force in the E Dorm. (Disano Dep., Doc. 48-1 at 31). He explained that a superior would probably take over if something was happening outside of policy, but "if everything seems to be going according to policy, then you'd have no reason to take over." (Disano Dep., 48-1 at 32). Disano also stated that it was the practice at the facility in the context of use of force situations (as distinguished from situations such as

a heart attack) that the inmate is always transported to a medical room for an assessment (as opposed to receiving immediate medical attention at the site of the force incident), even though the inmate may be unresponsive after the use of force. (Disano Dep., Doc. 48-2 at 101).

On the other hand, Asst. Warden Mashburn stated that if it was recognized that Villegas was in distress in the E Dorm, then medical care would have been provided to him there. (Mashburn Dep., Doc. 52-7 at 55-56). During his deposition, Mashburn was asked, "Had you felt that an immediate medical assessment should have been performed on Mr. Villegas at the E-dorm and not wait until he was transported by wheelchair to the F-dorm, you had the authority to take over that responsibility in order that it be done, correct?" (Mashburn Dep., Doc. 52-7 at 55). Mashburn replied, "If I had seen Villegas was in distress or recognized that he was in distress, I think all the people there would have done that." (Mashburn Dep., Doc. 52-7 at 55). Mashburn added, "I mean yes, if -- I think I or any of the staff that was there had recognized that Villegas was in distress at the moment, the medical care would have been given there." (Mashburn Dep., Doc. 52-7 at 55). Defendants also appear to concede (based on the testimony of the officers who testified as much) that K2 abuse was becoming an ongoing problem at the facility and that while they were learning about it, there was no training, policy, or procedure on what to do when encountering an inmate suspected of having used it. (Doc. 61, p.16).

Meanwhile, Plaintiff's expert, Aubrey Land, opined that, given the amount of pressure the officers were applying, which he described as a "very prolonged use of force," the situation was dangerous and an immediate medical assessment was necessary. (Land Dep., Doc. 76-1 at 150-51). Land further opined that, at the time it was confirmed that Villegas was restrained

by the call "hands on, feet on," every officer present "had an obligation to have him immediately assessed by medical." (Land Dep., Doc. 76-1 at 173). Land stated that everyone involved, up to and including Asst. Warden Mashburn, had an obligation to have Villegas immediately assessed by medical, but "intentionally chose to disregard his safety, disregard the policies, procedures, the directives, the post orders. . . ." (Land Dep., Doc. 76-1 at 254).

As to the use of force, Land also opined that, "the staff members involved in the use of force utilized excessive force against Inmate Villegas," citing the testimony of the officers who admitted to engaging in a prolonged engagement of force that was in reckless disregard of Villegas's safety. (Land Expert Report, Doc. 75-2 at 25). Land also found that, while Villegas was being transported, the officers put downward pressure on his head. Land opined, "[t]he downward pressure to the back of his head would be consistent with action that would restrict breathing and cause positional asphyxia, restricted blood circulation, or interference with physical functions that permit life processes to occur." (Land Expert Report, Doc. 75-2 at 25). Land stated that the supervisors violated policy by permitting the use of excessive force, both in terms of the officers putting their body weight on Villegas for several minutes and placing downward pressure on the back of his head. (Doc. 75-2 at 25).

Plaintiff's medical expert, Dr. Hughes, testified that there was evidence from the autopsy that revealed prolonged amounts of pressure exerted on Villegas. Hughes testified regarding the autopsy findings that included a subdural hemorrhage over the right fourth to sixth posterior ribs which is consistent with "extreme pressure being placed on his back," as well as other injuries consistent with restraint asphyxia (Hughes Dep., Doc. 77-1 at 91, 95). And, Dr. Hughes concurred that, at least at the point when Villegas was restrained, the

officers had a duty to do "an immediate assessment of Mr. Villegas then and there." (Hughes Dep., Doc. 77-1 at 68).

Indeed, the autopsy findings, report and testimony of Deputy Chief Medical Examiner Dr. Wendy Lavezzi support the opinions of Mr. Land and Dr. Hughes. During the autopsy, Dr. Lavezzi documented extensive injuries (both internal and external) that she later testified were consistent with restraint asphyxia, including petechiae (pinpoint hemorrhages) which occur because "the blood can't get where it needs to go." (Lavezzi Dep., Doc. 54-1, p. 46). She explained that there was enough pressure being placed on Villegas's back that it inhibited his breathing and blood flow. (Lavezzi Dep., Doc. 54-1, p. 46). Dr. Lavezzi also reviewed the video footage and testified that she could not opine regarding when Villegas stopped breathing because he was not assessed. She stated, "So unless that's done, do we absolutely know? No. He doesn't appear to move once he's sat up and put in the wheelchair, but that's all I can say because he wasn't assessed until he got to the F-dorm." (Lavezzi Dep., Doc. 54-1, p. 60).

As a final note, given that the Court must view the evidence in the light most favorable to Plaintiff and draw all reasonable inferences in favor of Plaintiff, it is worth mentioning that Lt. Gass, who acted as the officer in charge of the use of force incident, was the subject of considerable criticism in the deposition testimony. Plaintiff's expert, Land, was highly critical of Gass for not following proper procedure and becoming directly involved in use of force, which Land believed was both improper protocol and poor judgment. (Land Dep., Doc. 76-1 at 161-63).

## II.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In applying this standard, the Court reviews "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008). The Court considers the "evidence and reasonable factual inferences drawn therefrom in a light most favorable to the non-moving party." *Id.* The moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant is successful on this score, the non-moving party must then come forward with sufficient evidence to establish the existence of the elements on which she will bear the burden of proof at trial. *Id.* at 322-23. The non-moving party may not simply rest on the pleadings, but must use evidence such as affidavits, depositions, answers to interrogatories, or admissions on file to show that there is a genuine issue of material fact that remains for trial. *Id.* at 324.

## III.   DISCUSSION

The Defendants have filed motions for summary judgment (Docs 61 & 62) as to all claims asserted in this case, as well as Plaintiff's claim for punitive damages. The Court will address each of the claims in turn, beginning with the federal claims under § 1983.

### A.  Claims Under § 1983 Based on Excessive Force

First, the Court turns to Plaintiff's claim under § 1983 based on excessive force, which is brought in Count II against Lt. Gass, Sgts Key, Fender, Ake and Amrit, and COs McBride, Smith, Tifft, Perrotta and Foster. These Defendants have moved for summary judgment and assert qualified immunity. As an initial matter, Plaintiff does not oppose Defendant Amrit's motion for summary judgment (see Doc. 73, p.31 n.9); thus, his motion for summary judgment is due to be granted.

### 1.  Qualified Immunity

A threshold inquiry is whether the Defendants are entitled to qualified immunity, as they contend they are. The qualified immunity doctrine completely protects government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights. *Valdes v. Crosby*, 450 F.3d 1231, 1236 (11th Cir. 2006). The Supreme Court has set forth a two-part test for qualified immunity analysis. The first inquiry a court generally undertakes in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730,736 (2002). "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).[6]

Notably, in Eighth Amendment excessive force cases "the subjective element required to establish [the constitutional violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution." *Johnson v. Breeden*, 280 F.3d 1308, 1321-22 (11th Cir. 2002); *see also Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009). *Cf. Patel v. Lanier Cty. Georgia*, 969 F.3d 1173, 1186 (11th Cir. 2020) (stating "although the *Johnson/Fennell* exception continues to apply to Eighth Amendment Claims, we must abandon it as applied in the Fourteenth Amendment context."). In other words, Defendants here are not entitled to qualified immunity if Plaintiff has established a claim for excessive force in violation of the Eighth Amendment. *See Moreno v. Moore*, No. 3:18-CV-1472-BJD-JBT, 2021 WL 2685767, at

---

[6] Notably, although consideration of these factors in this sequence is often appropriate, it is not mandatory.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

*8 (M.D. Fla. June 30, 2021) ("the Court's qualified immunity analysis begins and ends with determining whether Plaintiff has alleged facts sufficient to survive summary judgment."). Thus, the Court turns to the question of whether Plaintiff has presented evidence sufficient to survive summary judgment regarding the claim for excessive force.

### 2. Constitutional Violation

"The law of excessive force in this country is that a prisoner cannot be subjected to gratuitous or disproportionate force that has no object but to inflict pain." *Skrtich v. Thornton*, 280 F.3d 1295, 1304 (11th Cir. 2002). Indeed, "beating a prisoner for noncompliance with a guard's orders after the prisoner had ceased to disobey or resist turns the 'clearly established law' of excessive force on its head and changes the purpose of qualified immunity in excessive force cases from one of protection for the legitimate use of force into a shield for clearly illegal conduct." *Id.* The Eleventh Circuit recently restated the subjective and objective elements for analyzing a claim for excessive force:

> In the prison context, an excessive force claim "requires a two-prong showing: an objective showing of a deprivation or injury that is sufficiently serious to constitute a denial of the minimal civilized measure of life's necessities and a subjective showing that the official had a sufficiently culpable state of mind." *Thomas*, 614 F.3d at 1304 (internal quotation marks omitted). Both inquiries are contextual, and the objective harm inquiry is responsive to contemporary standards of decency.

*Moore v. Hunter*, 847 F. App'x 694, 697-98 (11th Cir. 2021) (citing and quoting *Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010)).

"Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied in a good faith effort to maintain or restore discipline and not maliciously and sadistically to cause harm." *Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002). The Eleventh Circuit has articulated four factors to consider when determining whether force was

applied maliciously or sadistically, including (1) the need to apply force, (2) the relationship between that need and the amount of force applied, (3) the threat reasonably perceived by the responsible officials, and (4) any efforts made to temper the severity of the forceful response. *Id.* As the court observed in *Moore*, the extent of or absence of an injury is a factor to be considered in determining whether the force applied was "plausibly thought necessary." *Id.* "Moreover, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Id.* at 1301.

Here, there is no dispute that Villegas suffered a serious deprivation or injury: he died. The parties' dispute largely centers upon the second prong of the inquiry, i.e., whether the Defendants had a sufficiently culpable state of mind. To that end, the court should look to the factors set forth in *Skrtich,* 280 F.3d at 1300. Further, "[o]nce the need for force ceases, any continued application of harmful force can constitute an Eighth Amendment violation*."* *Moore*, 847 F. App'x at 698, citing *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) (per curiam).

Considering the factors set forth in *Skrtich*, when the evidence is viewed in the light most favorable to Plaintiff, there are sufficient material issues of fact to support the Plaintiff's theory that the force applied – which was sufficiently serious to constitute a denial of the minimal civilized measure of life's necessities – was inflicted maliciously or sadistically. First (and without repeating all of the detailed facts set forth above), the evidence suggests that when Villegas was first encountered in his cell he was in distress (he was unresponsive) and in need of medical care (or at least a medical assessment), but that after he was restrained an officer applied pressure to his chest and he responded violently. In fact, CO Foster testified

that if it was determined that Villegas was unresponsive (and according to the testimony he was when he was first encountered), officers should immediately provide a medical assessment and treatment. (Doc. 56-1, p. 96). Similarly, Sgt. Fender testified that if it was determined that Villegas was unresponsive, policy and procedure required that he be provided medical attention at the E Dorm. (Doc. 50-1, p. 98). What's important here is that instead of providing medical care, force was applied to his body – while he was shackled, even if his hands were shackled in front of him – and that the force was enough, as we know, to restrict his circulation and ability to breath. That force was almost continuously applied for upwards of 22 minutes by between five to at least seven men. It was applied, continuously, with numerous supervisors standing by (as will be discussed below).

All of this too with the contention that the officers knew inmates were overdosing from K2, that there was the smell of something burning when the initial officers entered the cell, and that Villegas' behavior was a drug overdose, as opposed to active resistance. In other words, he was in a medical emergency in need of attention as opposed to five bodies pushing down on him. Even without the K2 aspect, the force was constant, and the need for it is not obvious from the video (they yell "stop resisting", but the video doesn't show a level of resistance that dictated the level of response).

On this point, the Court finds that record evidence creates an issue of fact regarding whether the extent and duration of the force applied was out of proportion to the need. The evidence on this point also includes the testimony and opinions of Plaintiff's experts Aubrey Land and Dr. Hughes, as well as the medical examiner, Dr. Lavezzi. Land opined that the force used against Villegas was excessive, and specifically stated that the officers' actions (including securing Villegas in restraints and then removing them to reposition them) resulted

in a "prolonged engagement." (Doc. 75-2 at 25.) Land also criticized the officers for failing to avoid physically placing Villegas in a position that would contribute to positional asphyxia, and noted that officers were applying downward pressure to the back of Villegas's head during the transport. (Doc. 75-2 at 25). Meanwhile, as observed above, both Dr. Lavezzi and Dr. Hughes noted abundant evidence of "excessive pressure" being placed on Villegas for a prolonged period of time. (Hughes Dep., Doc. 77-1 at 90-91).

Although the officers can be seen to be struggling with Villegas, much of the time little movement is discernable on the part of Villegas. In fact, much of the time Villegas is obscured from view due to the numerous officers and supervisors gathered near him and restraining him. And, while Villegas can be heard gasping and moaning (particularly during the beginning of the incident) such behavior could also be consistent with having difficulty breathing. He was moving beneath the officers – or at least trying to – because he couldn't breathe.

As to the threat reasonably perceived by the responsible officials, it is notable that one of the first things the responding officers accomplished was to secure Villegas in handcuffs and leg irons while he was unresponsive. Other than a few moments when they used a tether to move his handcuffs from the front of his person to his back, both Villegas's hands and legs were restrained during the entire time force was being used. Whatever threat Villegas posed was necessarily reduced by the fact that both his arms and legs were bound.

Finally, Plaintiff presents evidence that efforts to temper the severity of the forceful response were not made. For example, Plaintiff points to the Medical Examiner's Report, autopsy findings, and testimony of Dr. Wendy Lavezzi, who determined that the cause of death was restraint asphyxia with excited delirium as a contributing condition, and the

manner of death was homicide. (Doc. 54-4). Dr. Lavezzi found numerous indications of pressure injuries during the autopsy. (Lavezzi Dep., Doc. 54-2 & 54-4). Similarly, as mentioned above, Plaintiff's expert, Dr. Timothy Hughes testified that there was evidence of "excessive pressure" being placed on Villegas's torso for a prolonged period of time. (Hughes Dep., Doc. 77-1, p. 90-91). Dr. Hughes also testified that the autopsy report revealed hemorrhages over various ribs that was consistent with extreme pressure being placed at the level of the fourth, fifth, and sixth rib. (Hughes Dep., Doc. 77-1, p. 91) Dr. Hughes testified that the autopsy report revealed dense petechial hemorrhages, bruising and other injuries consistent with pressure-type injuries. (Hughes Dep., Doc. 77-1, p. 95). Dr. Hughes found that there was compression on Villegas's posterior torso for over seven minutes. (Hughes Dep., Doc. 77-1, p. 91).

As an independent basis for the excessive force claim, Plaintiff points out that even after Defendants concede that Villegas was no longer resisting, the officers continued to use physical force to keep his body restrained in the wheelchair. Plaintiff contends that Villegas was positioned in the wheelchair with his neck hyper-flexed in a manner that did not protect his airway. Further, the COs used a custodial hold to apply downward pressure on his shoulders to keep him in the wheelchair. (Perrota Dep., Doc. 47-1 at 131 & Fender Dep., Doc. 50-1 at 78). Perrota stated, "we're also putting a downward pressure on his shoulders preventing him from lifting up, too." (Perrota Dep., Doc. 47-1 at 131). Indeed, several witnesses, including Land and Nurse Fischer, testified regarding the position of Villegas's head and neck and safety concerns regarding his airway.

Based on evidence including the video footage of the incident, the Medical Examiner's report, and the testimony of Dr. Hughes and Dr. Lavezzi, Plaintiff's expert Aubrey Land and

other fact witnesses, and considering the requisite factors, I submit that a factfinder could draw a reasonable inference that the force applied in this case was for the purpose of causing harm – that it had no object other than to inflict pain – and, therefore, Plaintiff's claim for excessive force is sufficient to survive summary judgment. Accordingly, Defendants Gass, Key, Fender, Ake, McBride, Smith, Tifft, Perrotta, and Foster (each of whom participated as described throughout this order and otherwise failed to stop each other) are not entitled to qualified immunity and their motion for summary judgment is due to be denied as to the claim in Count II under § 1983 alleging excessive force.[7]

### B.  Claims under §1983 Based on Deliberate Indifference to Medical Needs

The Court now turns to Plaintiff's claim under § 1983 alleging deliberate indifference to Villegas's medical needs (Count III). It is well settled that to establish an Eighth Amendment violation stemming from the deprivation of medical attention, a prisoner must set forth evidence of an objectively serious medical need and prove that the officials acted with attitudes of deliberate indifference to his needs. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A claim that a prisoner has been deprived of medical attention requires that the prisoner demonstrate (1) "an objectively serious medical need," so grave that, "if left unattended, poses a substantial risk of serious harm," and (2) that the officials' response was so inadequate as to "constitute an unnecessary and wanton infliction of pain," and was not "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). "It is obduracy and wantonness, not inadvertence or error in good faith, that

---

[7] As previously mentioned, based on Plaintiff's non-opposition, Amrit's motion for summary judgment is due to be granted as to this claim and Count III.

characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]" *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 1. Qualified Immunity

Once again, a threshold inquiry is whether the Defendants are entitled to qualified immunity. As stated above, the qualified immunity doctrine completely protects government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights. *Valdes v. Crosb*y, 450 F.3d 1231, 1236 (11th Cir. 2006). To reiterate, the first inquiry a court generally undertakes in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730,736 (2002). "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

### 2. Constitutional Violation

To state a claim for a violation of the Eighth Amendment for deliberate indifference to serious medical needs, Plaintiff bears the burden of proving: (1) that Villegas had an objectively "serious medical need," (2) that Defendants acted with subjective "deliberate indifference" to that serious medical need, and (3) that Villegas suffered an injury caused by Defendants' wrongful conduct. *Goebert v. Lee Cty.*, 510 f.3d 1312, 1326 (11th Cir. 2007).

A "serious medical need" is defined as one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *See Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019).

A serious medical need is also one "that, if left unattended, poses a substantial risk of serious harm." *Mann v. Taser Int'l Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (quotation omitted).

Under *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003), deliberate indifference requires a showing of more than mere negligence: "a prison official cannot be found deliberately indifferent under the Eighth Amendment 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Farrow*, 320 F.3d at 1245 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In other words, a defendant is deliberately indifferent to a plaintiff's serious medical need when he (1) has subjective knowledge of a risk of serious harm; (2) disregards that risk; and (3) acts with more than gross negligence. *See Harper v Lawrence Cty.*, 592 F.3d 1227, 1234 (11th Cir. 2010).

There is ample evidence in this case that Villegas had an objectively serious medical need and that he suffered an injury as a result of the Defendants' actions or inactions. Defendants contend, however, that Plaintiff cannot satisfy his burden of showing that the officers had subjective knowledge of the risk of serious harm, disregarded that risk, and acted with more than gross negligence.

 Defendants' argument, however, is belied by considerable evidence. As an initial matter, there is no dispute that the responding officers immediately perceived Villegas to be unresponsive and in need of medical attention. Indeed, their stated objective throughout the incident was to restrain him so that they could transport him to the medical room in the F Dorm. As set forth in their brief, however, Defendants suggest they perceived that Villegas's condition was not necessarily so dire as to require <u>immediate</u> medical intervention. For

example, Defendants point to the testimony of Sgt. Ake who felt that there was "no reason to bring the nurses on scene" to assess Villegas while he was sitting propped up against a table in the E Dorm. (Doc. 61 at 11, Ake Dep., Doc. 49-1 at 111).

On the other hand, it is undisputed that Villegas was intermittently unresponsive and vomited multiple times. It is also worth noting that the situation began with the COs discovering another inmate on top of Villegas in his cell and with possible evidence of synthetic marijuana use (the knowledge of prior, recent overdoses and at least the aroma of something burning).

I submit that, again based on ample evidence in the record including the video footage and the testimony of the officers, Nurse Fischer and Nurse Spencer, Deputy Chief Medical Examiner Dr. Lavezzi, and Plaintiff's experts Dr. Hughes and Aubrey Land, a factfinder could reasonably determine that Villegas had a serious medical need that was so obvious that even a lay person would recognize that he needed immediate medical attention. For example, both Nurse Fischer and Dr. Lavezzi testified that Villegas was not moving and should have been assessed while in the E Dorm. Land opined that, given all the circumstances, including the prolonged use of force and the downward pressure on Villegas that would restrict breathing and cause positional asphyxia, the officers "were well aware that Mr. Villegas needed immediate medical attention from the beginning of the incident and continuing for approximately 30 minutes thereafter." (Doc. 75-2 at 25). And Dr. Hughes concurred that, at least by the time he was restrained, the officers had a duty to do "an immediate assessment of Mr. Villegas then and there." (Hughes Dep., Doc. 77-1 at 68).

Villegas's condition as depicted in the video recordings is concerning at the outset and is even more concerning by the point that the officers propped him up against the table in the

E Dorm dayroom. Based on that footage, in which Villegas is apparently so limp and unresponsive that an officer is required to continually hold him up against the table, a factfinder could determine that Villegas had an immediate need for medical attention. Indeed, that is exactly the conclusion that multiple witnesses came to after observing the video footage. Likewise, Villegas's condition appears progressively more concerning as the officers hoisted him into the wheelchair and began transporting him to the F Dorm.

Based on the facts viewed in the light most favorable to the Plaintiff, the officers did disregard his need for an <u>immediate</u> medical assessment and medical attention throughout the encounter, which progressively worsened his condition. Defendants concede that prior to Villegas being propped up against the table, he had stopped resisting and was restrained with both handcuffs and leg irons. At that point, however, instead of attempting to assess his breathing and pulse themselves or calling the nurses to do an assessment and provide medical attention (despite the testimony of numerous witnesses that they should have done so and despite the presence of the nurses waiting just outside the E Dorm to perform such an assessment), the officers remained committed to transporting Villegas to the F dorm – the transport of which, evidence suggests, worsened his condition further – and deprived Villegas of crucial minutes. Indeed, the officers certainly knew that the process of getting Villegas to the F Dorm would take considerable additional time. At a minimum, it required putting Villegas into the wheelchair, exiting the building, walking some distance outdoors on walkways between the buildings, and making their way to the medical room in the F Dorm. Further, they made this decision when (according to the testimony of various witnesses) it was obvious Villegas was in distress.

The parties dispute exactly how long the delay was from the time Villegas was fully restrained to when he began receiving medical care in the F Dorm. Plaintiff points to evidence suggesting it was a ten-minute delay, and Defendants concede that more than five minutes elapsed from the time Villegas was fully restrained until he was in the medical room. (By fully restrained they mean, restrained with his hands behind his back, as opposed to in front, where they were since the first minute of the encounter, while he was unresponsive.) The video footage (which elapses in real time) establishes that it was a matter of at least several minutes. Plaintiff contends that the delay amounts to deliberate indifference because time was of the essence given Villegas's condition. *See Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005) (finding that, where inmate was unconscious, a delay of fourteen minutes is actionable under the Constitution).

Considering the facts in the light most favorable to Plaintiff, I submit that there is ample evidence to satisfy the subjective prong of the deliberate indifference inquiry. All the officers (including the supervisory defendants Gass, Disano, Lee and Mashburn) involved witnessed Villegas's condition first-hand and yet none provided or called for immediate medical attention or an assessment. As the Eleventh Circuit has explained, "[a] jury doesn't need direct evidence of [the officers'] state of mind but, rather, may infer the necessary subjective facts from circumstantial evidence – including inferences – 'from the very fact that the risk was obvious.'" *Patel v. Lanier Cty. Georgia*, 969 F.3d 1173, 1189 (11th Cir. 2020), *citing Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007).

Here, the circumstantial evidence would allow a jury to infer subjective knowledge of a risk of serious harm because (1) the officers witnessed Villegas's condition such that even a layperson could recognize the risk; and (2) the officers were not laypersons but were

Corrections Officers trained in medical emergencies and basic life support. A jury could also find "disregard" of the risk based on the officers' failure to provide medical intervention or order or conduct a first responder assessment at any point, particularly once Villegas was restrained, no longer resisting, and lying restrained in the floor or propped up against the table. Indeed, there is testimony that they could and should have provided such an assessment.

The circumstantial evidence also includes the testimony and documentation regarding a post use of force policy, including testimony regarding Florida Administrative Code 33-602.210, for "Medical Attention Following Use of Force," which provides that "[a]appropriate medical treatment shall be provided immediately." (Fender Dep., Doc. 50-1 at 56, 98). Sgt. Fender even testified that if it had been determined that Villegas was unresponsive, policy and procedure would have required him to receive medical attention on site at the E Dorm. (Fender Dep., Doc. 50-1 at 98).

Not only did the officers send the nurses away (and fail to call them back), but they themselves failed to even perform a basic first responder assessment at any point. Further, the officers offer little explanation for that failure other than their testimony that they did not know of Villegas's need. In *Bozeman*, 422 F.3d at 1273, the Eleventh Circuit analyzed a similar situation in a deliberate indifference case in the prison context. The court found that record evidence would allow a jury to find that the inmate was unconscious and not breathing while being carried from his cell to another location for a post use of force assessment. In determining that there was sufficient evidence of a constitutional violation and that the officers involved were not entitled to qualified immunity, the court reasoned:

> The Officers offer no explanation – medical or non-medical – for the failure to (1) check Haggard's breathing or pulse; (2) call for

> medical assistance; or (3) administer CPR themselves, during the fourteen minutes in question. They do offer another plausible version of the facts tending to show that the Officers actually did not know of Haggard's need, but this story is not the same thing as offering a reason – if one accepts the Officers did know – for the delay in giving help. We conclude, therefore, that, because of the urgent nature of the medical need in this case and because of the (lack of any) reason for the corresponding delay in case, a delay of fourteen minutes is actionable under the Constitution, given the circumstances here.

*Id.* at 1273.

In the circumstances here, the evidence supports a conclusion that the officers were deliberately indifferent, and that their deliberate indifference caused or contributed to Villegas's death. Indeed, I submit that the video footage, medical evidence, fact witness, and expert testimony is sufficient to establish a jury question as to each of the elements of a deliberate indifference claim for each officer involved in this Count, including injury.

In *Walton for Est. of Smith v. Fla. Dep't of Corr.*, No. 3:16-CV-1130-J-39JRK, 2020 WL 5255088, at *21 (M.D. Fla. Sept. 3, 2020), a case with similar facts, this court denied summary judgment as to plaintiff's claims for wrongful death, conspiracy, excessive force, deliberate indifference, and discrimination against certain defendants. In *Walton*, plaintiff offered evidence that the decedent, Frank Smith, a mentally ill inmate, was subjected to excessive force during a medical transport, and that FDOC defendants were then deliberately indifferent to his serious medical needs. *Id.* at *2. As to the deliberate indifference claims, plaintiff cited evidence that defendants acted with reckless disregard by moving Smith in a wheelchair when he was unable to move on his own and had an obvious head injury, and by not summoning medical professionals prior to moving him. *Id.* at *6. The court observed:

> A jury confronted with the video and photographic evidence of Smith in the wheelchair reasonably could conclude Defendants Ellis and Swain had to have noticed Smith was unconscious or

> severely injured. The still photo alone shows Smith's head hanging back unnaturally. See Pl. FDOC Resp. Ex. 2. Additionally, all who reviewed the video concluded it was apparent Smith was unconscious. Aubrey Land [plaintiff's expert] noted, "Smith is observed in a wheelchair with his head back in an unnatural position. His [mouth] is open and no movement is observed." See Pl. Norman Resp. Ex. 3 at 9. Land even emphasized (in italics and underlining): "Mr. Smith displays no signs of movement or consciousness during any portion of the video." Id. at 10. Land found it "disturbing that trained staff would move an injured inmate or any person in such manner."

*Id.* at *11. The court reasoned, "[v]iewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, a jury reasonably could conclude that officers with even limited first aid training who saw Smith in the wheelchair would have appreciated Smith's condition and intervened." *Id.* at *12. Ultimately, the court denied summary judgment as to the allegedly responsible defendants and permitted the case to proceed to trial on plaintiff's claims for wrongful death, conspiracy, excessive force, deliberate indifference, and discrimination under the Americans with Disabilities Act and Rehabilitation Act. *Id.* at *21. The court also denied summary judgment as to the claim for punitive damages under §1983. *Id.* at *20.

Indeed, the facts alleged in the *Walton* case and this case are quite similar. Based on the principles and reasoning cited in *Walton* and the other precedent noted above, I submit that Plaintiff has established a constitutional claim that the officers were deliberately indifferent to Villegas's serious medical needs.

### 3. Clearly Established Right

Having established a constitutional violation for deliberate indifference to serious medical needs, the court must now turn to the second step of qualified immunity – whether the right that Villegas alleges was clearly established. It was.

First, the Court observes that there are controlling cases in the Eleventh Circuit with analogous facts that Plaintiff has identified. *See Bozeman v. Orum*, 422 F.3d 1265 (11th Cir .2005), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 390 (2015) (holding that officers' actions in transporting unconscious inmate resulting in a fourteen-minute delay in providing medical attention is an actionable constitutional claim for deliberate difference), *and Patel v. Lanier Cty. Georgia*, 969 F.3d 1173 (2020) (holding that deputy's inaction in obtaining medical attention for pretrial detainee who was unconscious after being left in a hot vehicle established a constitutional violation).

Significantly, as to the deliberate indifference claim, the facts of *Bozeman* are indistinguishable from this case in all relevant respects. Like this case, in *Bozeman*, officers attempted to transport an inmate for a medical assessment following a use of force incident, though evidence existed that the inmate was unconscious and not breathing while being carried from his cell. Like this case, the plaintiff in *Bozeman* proffered evidence that the officers disregarded the inmate's urgent medical needs, including failing to check his breathing and pulse for several minutes. *See* 422 F3d at 1273. In *Bozeman*, evidence demonstrated that the delay was fourteen minutes which the court found actionable under the Constitution. The several minute delay in this case is factually indistinguishable from the delay in *Bozeman*, particularly considering the delay caused by the time it took the officers to transport Villegas to the F Dorm. Consequently, I submit that by identifying *Bozeman*, which is a factually indistinguishable Eleventh Circuit controlling case, Plaintiff has satisfied his burden of demonstrating that the right was clearly established.

The Court also finds that the unique facts of this situation are governed by a "broader, clearly established principle." *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*,

904 F.3d 1248, 1259 (11th Cir. 2018). "The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Ancata v. Prison Health Servs.,* Inc. 769 F.2d 700, 704 (11th Cir. 1985). As the Eleventh Circuit stated in *Patel*, 969 F.3d 1173, 1190, "[t]his broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do nothing to address it, they violate the Constitution."

Based on the above, I submit that the evidence supports a finding that the officers failed to provide the needed medical assessment and intervention, and that such failure in the face of an obvious and known serious need is unconstitutional. Consequently, the Defendants are not entitled to qualified immunity.

### C. Claims Under §1983 based on Supervisory Liability

The Court next turns to the motions of Defendants Gass, Disano, Lee and Mashburn, the supervisory defendants against whom claims for supervisory liability have been alleged. (Docs. 61 & 62).

Defendants Gass, Disano, Lee and Mashburn argue that they are entitled to summary judgment on Plaintiff's claim for supervisory liability (Count IV of the Second Amended Complaint). Although alleged as one count, Count IV effectively includes multiple theories of liablity. First, Plaintiff's claim alleges supervisory liability on the part of these four Defendants based on failure to train and to enact policies and procedures regarding the use of K2. Plaintiff alleges:

> Defendants, GASS, DISANO, LEE, and MASHBURN had the responsibility to train correctional officers, and failed to train Defendant correctional officers and sergeants in the recognition, custody, care and control and/or handling of inmates who were

> experiencing adverse reactions and overdoses to K2, given the past widespread K2 abuse eclipsing epidemic proportions, and yet, Defendants, GASS, DISANO, LEE, and MASHBURN intentionally and deliberately failed to enact and/or adopt policies necessary to prevent these Constitutional violations.

(Doc. 26, p. 22).

Plaintiff also alleges that the supervisory defendants failed to properly supervise the COs when handling Villegas's situation, and that they employed a custom, policy and practice of violating the proper procedures. Plaintiff alleges:

> Defendants, GASS, DISANO, LEE, and MASHBURN failed to properly supervise the Defendant correctional officers and sergeants to ensure that they properly handled VILLEGAS' serious medical condition of which all Defendants were clearly aware (Doc. 26, p. 22); and,

> Defendants, GASS, DISANO, LEE, and MASHBURN, while acting under color of state law, and by virtue of the authority vested in them by the State or its agencies, employed a custom and practice of violating its own policies and procedures, which resulted in the deliberate indifference to VILLEGAS' serious medical needs, and knowing that the failure to do so, would result in serious medical consequences, including the death of VILLEGAS (Doc. 26, p. 23).

While these supervisory liability claims alleged in Count IV are all related, they can be separated into three basic claims: (1) general supervisory liability regarding the Villegas incident; (2) failure to train regarding serious medical conditions related to K2 use; and (3) custom and practice of violating policy resulting in deliberate indifference to Villegas's serious medical needs.

### 1. General Supervisory Liability Regarding the Villegas Incident

"Supervisory liability under § 1983 occurs either when the supervisor personally participates in the unconstitutional conduct or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*,

326 F.3d 1352, 1360 (11th Cir. 2003*), abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). Further, "the causal connection may be established when a supervisor . . . knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.*

Here, while each supervisory defendant arrived at the scene at a different time, there is no dispute that each of the supervisory defendants was on duty at the time of the incident, responded to the scene and was present and observing what transpired, if not actively involved. Taking into account the testimony in this case, as well as the video recordings, there is sufficient evidence to create an issue of fact regarding whether these supervisors either acted unlawfully themselves, directed the other COs to act unlawfully, or knew that they would act unlawfully and failed to stop them from doing so.

First, Defendant Gass was directly involved as the officer in charge and was also physically involved in the use of force. There is substantial evidence that Gass was both involved in a hands-on way in the use of force, and in directing the other officers as well. Indeed, that fact is one of which Plaintiff's expert Aubrey Land was highly critical. Land opined, "[r]ather than supervising the use of force incident, Gass engaged in the use of force. As the highest -ranking correctional staff present Lt. Gass should have taken command and direct[ed] staff actions and responses." (Doc. 75-2 at 14).

Meanwhile, Defendants Mashburn, Lee and Disano were all present and observing in their capacity as supervisors during the use of force incident involving Villegas. (Disano Dep., Doc. 48-2 at 22). Disano also testified that, although it is unlikely, anyone who outranks another in the chain of command can take over. (Disano Dep., Doc. 48-1 at 31). Similarly, Plaintiff's expert Aubrey Land testified that "ultimate command can change in a split

second," and that good leadership practices would be to interject when necessary to err on the side of caution. (Land Dep., Doc. 76-1 at 168-69). In other words, there is evidence that either Mashburn, Lee or Disano could have stepped in and taken over for Lt. Gass or the other officers at any point during the incident. Beyond that, Land opined that they should have taken over, and that all the actions of the officers occurred under the supervision of Gass, Disano, Lee and Mashburn and continued uncorrected. (Doc. 75-2 at 25). Land specifically opined that the supervisors disregarded Villegas's need for immediate medical attention and allowed staff to apply pressure to his torso and neck in a manner to cause positional asphyxia and denied him timely medical care such that they were deliberately indifferent to his rights. (Doc. 75-2 at 25-26).

The court does acknowledge the argument (primarily advanced by Mashburn) that at all relevant times Lt. Gass was the officer in charge. Mashburn argues that "at no time was he [Mashburn] the officer in charge or in command of the use of force situation." (Doc. 82 at 4). Mashburn further argues that he did not observe anything that he believed was a violation of policy or wrongful conduct. When the facts are viewed in the light most favorable to Plaintiff, however, an inference could be drawn that Mashburn, Lee, and Disano were present with full knowledge of what was occurring and declined to intervene – as to both the use of force and deliberate indifference to Villegas' medical needs. Their testimony and the video footage confirms that each of the supervisory defendants was present during the relevant portions of the use of force incident, and that the actions of the other officers took place under their direct supervision. They each saw the officers' use of force in restraining Villegas and his condition afterwards. They each were present and observed as Villegas was placed in the wheelchair and was wheeled out of the E Dorm. They were each present and supervising as

other officers applied downward pressure on Villegas while in the wheelchair. They were each present while no one assessed whether Villegas was breathing or had a pulse, or ordered such an assessment, and they failed to order an assessment themselves. In other words, they were each present and supervising the acts and omissions that establish both Plaintiff's claim for excessive force and for deliberate indifference to medical needs. Based on the record evidence, and because a causal connection may be established when a supervisor "knew that the subordinates would act unlawfully and failed to stop them from doing so," summary judgment is due to be denied on the claims for supervisory liability against Defendants Gass, Disano, Lee and Mashburn. *Cottone,* 326 F.3d at 1360.

### 2. Failure to Train Regarding Serious Medical Conditions Related to K2 Use

Under § 1983, a supervisor can be held liable for failing to train his or her employees "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact. *Keith v. KeKalb Cty., Georgia*, 749 F.3d 1034, 1052 (11th Cir. 2014) (citations omitted). A plaintiff alleging a constitutional violation based on failure to train must demonstrate that the supervisor had "actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate citizens' constitutional rights," and that armed with that knowledge the supervisor chose to retain that training program. *Id.* at 1052 (citation omitted). Further, a pattern of similar constitutional violations by untrained employees is typically necessary to establish that a supervisor was on actual or constructive notice of the deficiency of training. *Id.* at 1053.

Here, Defendants argue that Plaintiff cannot establish such a pattern because no such pattern exists. Defendants also assert the familiar defense of qualified immunity and contend that regardless of whether a constitutional violation in failing to train occurred, Plaintiff

cannot establish that the supervisory defendants violated clearly established law. Defendants contend that "it was not clearly established that special training for the recognition, custody, care, and control and handling of inmates who were experiencing adverse reactions and overdoses to K2 is required." (Doc. 61, p. 42). The Court agrees with the Defendants on this issue.

First, the Court notes that Plaintiff has proffered evidence, including the report and testimony of his expert Aubrey Land, that Plaintiff argues establish that K2 related use of force incidents were documented at Lake Correctional Institution and that upper management was aware of the danger of K2. Plaintiff contends that there was an "ongoing problem" with K2, and that more than ten inmates died due to K2 overdoses, a fact that was known to the facility's management. (Doc. 73, p. 6). In support of this argument, Plaintiff proffers other evidence, including testimony of the COs, including Captain Disano that there had been numerous incidents involving K2 at the facility. To be sure, there is substantial record evidence regarding concerns regarding K2 at Lake Correctional Institution.

What Plaintiff has not demonstrated, however, is that it was clearly established that special training for the recognition, custody, care, and control and handling of inmates experiencing reactions to K2 is required. Indeed, Plaintiff cites not a single case demonstrating that the state of the law at the time of this incident gave Defendants fair warning that their training program was deficient to the point of being unconstitutional because it failed to specifically address K2 issues.

It is Plaintiff's burden to demonstrate that the right allegedly violated was clearly established at the time of the alleged violation. *See Marbury*, 936 F.3d at 1232-33. Plaintiff cites *Davies v. Israel*, 342 F. Supp. 3d 1302 (S.D. Fla. 2018), arguing that in an analogous

situation, the court found that a widespread custom or policy that encouraged officials to delay emergency treatment to critically ill patients may constitute a deliberate indifference to serious medical needs. Plaintiff's reliance on *Davies* is not sufficient to defeat qualified immunity on the claim here because: (1) it is not controlling precedent; (2) it was decided on September 10, 2018, and not prior to the subject incident which occurred on March 28, 2017; (3) and it does not resolve the constitutional question beyond debate. *See Patel*, 969 F.3d at 1186.

Thus, Defendants are entitled to qualified immunity, and the Court need not decide the underlying question of whether a constitutional violation may have occurred due to the Defendants' failure to train regarding K2 issues.

### 3. Custom and Practice of Violating Policy Resulting in Deliberate Indifference

The final claim contained within Count IV alleging supervisory liability is that Defendants employed a custom and practice of violating the FDOC's own policies and procedures, which resulted in the deliberate indifference to Villegas's serious medical needs. For the following reasons, the Court finds that this claim is sufficient to survive summary judgment, and that Defendants Gass, Lee, Disano and Mashburn against whom it is alleged are not entitled to qualified immunity.

Evidence in the record regarding the policy for providing medical attention includes Florida Administrative Code 33-602.210, regarding use of force, which provides (as noted above): "Medical Attention Following Use of Force. Appropriate medical treatment shall be provided immediately or, in the case of a riot or other man-made or natural disaster, as soon as possible following resolution of the riot or disaster." (Doc. 75-6, p. 15). Plaintiff's expert Aubrey Land also testified regarding numerous specific FDOC policies (including general

post orders, medical emergency policy, and cell extraction orders) that he opines would have required the officers and supervisors to provide Villegas with an immediate medical assessment and medical attention at the site of the use of force incident (E Dorm or the day area of E Dorm, as opposed to F Dorm). (Land Dep, Doc. 76-1 at 174-78). As Land testified, once the use of force ceased, the situation reverted to a medical emergency and the relevant policies would have required an immediate assessment. That testimony was consistent with the testimony of Asst. Warden Mashburn, who testified that if Villegas had been in distress in the E Dorm, medical care would have been provided to him there, without a delay for transport to the F Dorm. (Mashburn Dep., Doc. 52-7 at 55).

Despite those policies, and cases such as *Bozeman* (addressed above), witnesses testified that it was not the practice at Lake Correctional Institution that a medical assessment or medical attention would be given at the site of the use of force incident. Rather, it was the practice that an inmate needing attention following a use of force incident would be transported to a treatment room for assessment or treatment. For example, Disano testified that the protocol was that assessments were not typically done at the site of the use of force incident. Rather, the practice was to take the inmate to a treatment room for assessment and treatment. (Doc. 48-2, p. 98-100). In contrast, Disano explained that, in other situations such as an inmate having a heart attack, both a medical assessment and interventions such as CPR would be given at the site where the inmate was located. (Doc. 48-2, p. 100).

Here, there is sufficient evidence to show that the supervisory Defendants employed a custom and practice of declining or otherwise failing to provide necessary medical care to an inmate post use of force by declining treatment at the site of the incident and insisting on transport to the medical room, which, in this case, caused the officers' deliberate indifference

to Villegas's serious medical needs. Indeed, Plaintiff submits evidence that they had this custom and practice in contravention of their own FDOC policies and procedures that otherwise called for prompt medical care. *See Davies v. Israel*, 342 F.Supp. 3d 1302 (11th Cir. 2018).

To defeat qualified immunity, Plaintiff relies on *Davies v. Israel*, 342 F. Supp. 3d 1302 (11th Cir. 2018) and *Bozeman v Orum*, 422 F.3d 1265 (11th Cir. 2005). While *Davies* is not sufficient to meet this burden, I submit that, by citing the principles in *Bozeman*, Plaintiff has identified a broader, clearly established principle that should govern the novel facts of this situation. *See Patel*, 969 F.2d at 1186. *Bozeman* stands for the proposition that a prison official acts with deliberate indifference when he fails to provide adequate and timely medical treatment to a prisoner who has fallen unconscious. *See* 422 F.3d 1265.

If Plaintiff's version of the facts is credited, then Lake Correctional Institution had a custom and practice (or unwritten policy) of always delaying medical assessments and medical treatment following use of force incidents until the inmate had been transported to a medical room. And, under Plaintiff's version of the facts, that practice was sanctioned by each of the supervisory defendants, and contrary to official written policy. I submit that the clearly established principles in *Bozeman* would have put the Defendants on notice that their unwritten policy requiring transport to a medical room without adequate regard to the urgency of an inmate's medical needs obviously violated the Constitution. In the specific context of this case, the Plaintiff has met his burden by both identifying a broader, clearly established principle that would govern (i.e., the principles in *Bozeman*) and by showing that Defendants' conduct in implementing the unofficial policy so obviously violated the

Constitution that more specific prior case law is unnecessary. *See Crocker v. Beatty*, 995 F.3d 1232, 1241 (11th Cir. 2021).

This method of establishing that a right is clearly established is a path "rarely trod." *Id.* at 1240. Indeed, when a plaintiff relies on a "general rule[ ]" to show that the law is clearly established, it must "appl[y] with obvious clarity to the circumstances." *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007) (quotation marks omitted; emphasis added); *see also Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) ("[I]f a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question.").

Thus, the Court must consider, is it truly obvious that the general principles in *Bozeman* apply to this specific situation? Do the *Bozeman* principles apply with obvious clarity to the circumstances of this case? I submit that they do. In this claim, the supervisory defendants are sued for establishing an unofficial practice or custom of always transporting inmates to a medical room following a use of force incident, regardless of whether the inmate had an immediate medical need. That policy or practice was not only contrary to the facility's written policies, but directly resulted in deliberate indifference to Villegas's urgent medical needs in the circumstances of this case. In *Bozeman*, the Eleventh Circuit held that delaying an inmate's medical needs for several minutes while transporting him to a medical room was actionable under the Constitution. 422 F.2d 1265. Given the totality of the circumstances, I submit that those principles apply with obvious clarity to the facts of this case such that Plaintiff has met his burden of demonstrating a clearly established right.

Consequently, the supervisory defendants are not entitled to qualified immunity, and their motion for summary judgment as to the claim for supervisory liability arising from a

custom and practice of violating policy resulting in deliberate indifference to serious medical needs is due to be denied.

### D. Negligence Claim under Florida's Wrongful Death Act

In addition to the federal claims discussed above, Plaintiff has also alleged a state law claim under Florida's Wrongful Death Act against the FDOC and Warden Sheila Cumbie. Under the Florida Wrongful Death Act, a tortfeasor is liable for damages "[w]hen the death of a person is caused by the wrongful act [or] negligence of any person . . . [if] the event would have entitled to person injured to maintain an action and recover damages if death had not ensued." Fla. Stat. §768.19. Under Florida law, the elements of a cause of action for negligence are "the existence of a duty, breach of that duty, causation, and damages." *Horton v. Freeman*, 917 So.2d 1064, 1066 (Fla. 4th DCA 2006).

While Defendants contend that "no reasonable jury could conclude that Lt. Gass, Sgt. Key, Sgt. Fender, Sgt. Ake, Sgt. Amrit, CO McBride, CO Smith, CO Tifft, CO Perrotta, CO Foster, Captain Disano, Major Lee and Assistant Warden Mashburn breached the duty of care owed to Villegas by failing to provide him with prompt medical care while he was incarcerated at Lake CI," the undersigned disagrees. As explained above, the Court has already concluded that Plaintiff has stated claims under § 1983 for both excessive force and deliberate indifference to Villegas's serious medical needs. For the same reasons, I find there is also sufficient evidence to support Plaintiff's claim of negligence under Florida's Wrongful Death Act as to the FDOC. Consequently, Defendants' motion for summary judgment is due to be denied as to the FDOC in Count I.

Notably, Plaintiff does not oppose the motion for summary judgment as it relates to Warden Sheila Cumbie in her official capacity in Count I. Indeed, the wrongful death claim

is brought against Cumbie only in her official capacity as Warden and is duplicative of the claim against the FDOC. Accordingly, Cumbie's motion for summary judgment is due to be granted. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11ᵗʰ Cir. 1991).

### E.  Punitive Damages under §1983

Finally, Defendants move for summary judgment regarding Plaintiff's claim for punitive damages as to Counts II, III and IV under section 1983. Defendants contend that nothing in the records supports the assertion that any of their conduct was motivated by evil motive or intent, or that it involved reckless or callous indifference to Villegas's federally protected rights.

In section 1983 actions, punitive damages are available "where a defendant's conduct is motivated by evil intent or involved callous or reckless indifference to federally protected rights." *Barnett v. MacArthur*, 715 F. App'x 894, 904 (11ᵗʰ Cir. 2017). Based on all the evidence discussed above, I submit that Plaintiff has proffered facts that plausibly support a finding that those involved were callous or recklessly indifferent to Villegas's federally protected rights. *See Davies v. Israel*, 342 F. Supp. 3d 1302 (S.D. Fla. 2018) (denying motion to dismiss punitive damages where Plaintiff plausibly alleged claim for deliberate indifference based on inmate's failure to immediate emergency medical care). All of the actions and inactions discussed at length above in the background section, as well as with respect to each Count, reveal Villegas was in need of medical attention, had force applied to him for over 22 minutes while in handcuffs and leg irons, and remained in need of medical care throughout, with the need becoming progressively more dire. Accordingly, the motion for summary judgment is due to be denied as to Plaintiff's claims for punitive damages.

## IV.    CONCLUSION

For the reasons explained above, it is respectfully recommended that Defendants' motions for summary judgment (Doc. 61 & 62) be granted in part and denied in part. Defendants' motions for summary judgment should be granted only as to Count I alleging negligence under Florida's Wrongful Death act against Warden Sheila Cumbie in her official capacity (Doc. 61), and as to Count IV to the extent it alleges failure to train or enact policies related to K2 (Docs. 61 & 62), and as to all claims against Defendant Anildat Amrit (Doc. 61). In all other respects, Defendants' motions for summary judgment should be denied.

Recommended in Ocala, Florida on September 24, 2021.

PHILIP R. LAMMENS
United States Magistrate Judge

c: Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy