# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

DOUGLAS B. STALLEY,
as representative of the estate
of JOSE GREGORY
VILLEGAS and on behalf of
ZV and DV, minor children of
the deceased,

      Plaintiff,

v.                                                   Case No: 5:19-cv-0280-KKM-PRL

SHEILA CUMBIE, et al.,

      Defendants.

_____

## <u>ORDER</u>

      In cases like this one, prison officials must "balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if [they] use force." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). They act "in haste, under pressure, and frequently without the luxury of a second chance." *Whitley v. Albers*, 475 U.S. 312, 320 (1986).

      On March 28, 2017, prison staff at Lake Correctional Institution discovered inmate Jose Villegas unconscious in his cell. When they attempted to rouse him, Villegas awoke and fought them. As many as seven officers wrestled to restrain him. About twenty minutes

later, Villegas was finally calmed and fully secured. No one checked Villegas's pulse or formally assessed his health at that time. Instead, the officers lifted Villegas into a wheelchair and transported him for a medical assessment in a treatment room in an adjacent building. While pushing the wheelchair, two or three officers kept their hands on Villegas, pushing down on his shoulders, head, and neck.

Although the buildings were close together, approximately six minutes elapsed between when the officers restrained Villegas and when they arrived in the treatment room. (Doc. 73 at 20–21, 31 n.8.) Once there, nurses discovered that Villegas was not breathing. The nurses and officers immediately began CPR. Despite their efforts to revive him, Villegas was pronounced dead upon arrival at a nearby hospital, approximately an hour after the officers discovered him in his cell.

The personal representative of Villegas's estate alleges that the officers violated federal and state law in their efforts to restrain Villegas and in their provision of medical care. Relatedly, he also alleges that the facility supervisors present on the scene are liable for their participation in the incident, their failure to properly train the officers, and their decisions to encourage or allow staff to delay medical treatment.

Despite the tragic consequences of Defendants' action and inaction, the Court concludes that Plaintiff fails to prove that Defendants violated the Eighth Amendment's prohibitions on excessive force or deliberate indifference. Defendants are thus entitled to

summary judgment on those claims. Without proof of an underlying violation of constitutional rights, Plaintiff's claims against the supervisory Defendants also fail. The Court also concludes that, in the alternative for the deliberate indifference claim, Plaintiff fails to prove that it was clearly established that Defendants' conduct violated the Eighth Amendment, and Defendants are thus entitled to qualified immunity on that claim. And so, Defendants are entitled to summary judgment on Plaintiff's federal claims. Without these claims—and the basis for this Court's original jurisdiction—the Court declines to exercise supplemental jurisdiction over the remaining state law claim.

## I.   BACKGROUND[1]

On March 28, 2017, two correctional officers at Lake Correctional Institution walked the perimeter of E-dorm, checking each inmate's cell. As the officers approached the cell assigned to Jose Villegas, they noticed something unusual. Villegas was lying face up on the cell floor. He was not moving. The officers called for assistance.

Sergeant Henry Fender and Officer Dalton Tifft entered "the cell to try and assess the situation." (Doc. 50-1 at 35.) They saw Villegas lying motionless on the floor. (Doc. 50-2 at 4.) Fender noticed the "strong odor of something burning." (Doc. 50-1 at 26.) Although Fender and Tifft did not know it at the time, (*id.* at 26), the smell was K2, a

---

[1] The Court recounts the undisputed facts as contained in the record. To the extent facts are disputed or capable of multiple inferences, the Court construes the record in favor of the nonmovant, Plaintiff. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020).

form of synthetic marijuana. Prison staff later found K2 in the cell, (Doc. 48-3 at 7), and the autopsy found it in Villegas's system, (*id.* at 21; Doc. 54-1 at 9, 43). K2 is linked to a range of symptoms, including erratic or violent behavior, difficulty breathing, and cardiac arrhythmia. (Doc. 47-1 at 78; Doc. 54-1 at 71.) K2 use was an increasingly serious problem at the facility, though there was no official policy or training on how officers should respond to an inmate on K2. (Doc. 61 at 16 (collecting record citations).)

After removing Villegas's cellmate from the cell, Fender and Tifft called out "wake up inmate, are you okay?" (Doc. 57-1 at 71; Doc. 50-1 at 21.) Villegas did not respond. (Doc. 57-1 at 71–72.) Fender handcuffed Villegas with his hands in front of him. (*Id.* at 26.) Tifft and Officer William Smith (who had since arrived), applied leg restraints. (Doc. 50-1 at 22, 43; Doc. 57-1 at 72.) Seeing labored breathing and signs of recent vomiting, (Doc. 50-1 at 43), the officers put Villegas in a recovery position, turning him on his side with his arms stretched out and head positioned "to give [him] a proper clear airway," (Doc. 57-1 at 36). As he was trained, Fender attempted to arouse Villegas by applying a sternum rub. (*Id.* at 32, 37.)

Suddenly, Villegas "became actively combative." (Doc. 51-1 at 141; Doc. 56-1 at 17; Doc. 57-1 at 73; Doc. 50-1 at 37.) Villegas "was kicking and attempting to strike staff with his fist." (Doc. 50-6 at 6.) Four or five officers responded by using their hands, knees, and body weight to force Villegas into a prone position. (*Id.* at 6–7.) Undeterred, Villegas

4

grabbed Fender's hand and tried "to spit and bite him." (*Id.*; Doc. 47-1 at 38.) Villegas, who weighed 275 pounds, (Doc. 54-4 at 3), continued fighting despite the officers' commands to stop. (Doc. 50-6 at 6.)

As the struggle continued, Officer Brent McBride and Sergeant Anthony Key arrived. So did nurses Tammy Spencer and Paula Fischer. Fischer, looking into the cell, saw multiple officers trying to restrain Villegas and yelling "stop resisting." (Doc. 51-1 at 149.) According to Fischer, "he was absolutely resisting" and the officers "were having a hard time restraining him." (*Id.*) Villegas was combative and made loud "grunting or growling sounds." (*Id.* at 150.) McBride called for a hand-held camera to record the incident.[2] (Doc. 48-3 at 13.)

Attempting a five-man carry, Fender, Key, Tifft, McBride, and Smith pulled Villegas out of the cell so that "they had more room to try to restrain him." (Doc. 51-1 at 151; Doc. 50-1 at 43.) Villegas grabbed at the bunk to stop them. (Doc. 57-1 at 75; Doc. 77-1 at 50.) Once in the dayroom, Villegas continued to "violently" resist, physically exhausting the officers. (Doc. 51-1 at 151.) He exhibited "super-human strength" and the "strength of a grizzly bear." (*Id.* at 66–67.) The officers exhorted Villegas to "please stop

---

[2] In addition to the handheld video, a fixed video camera in the corner of E-dorm captured the scene. The Court incorporates the perspective captured by both cameras in this account. The handheld video provides the superior vantage, yet it reveals only limited movements of Villegas, as the officers obstruct much of the direct view of Villegas's movements throughout the struggle until he is fully secured. (Doc. 77-1 at 49–52 (Plaintiff's expert Dr. Timothy Hughes explaining that, "for the most part, you can't really see Villegas" or "see from the video what's going on.").)

resisting." (*Id.* at 66.) The officers used their arms and legs to hold Villegas down "because he kept trying to get up and get away." (Doc. 49-1 at 60.) Realizing that the five officers "could not get [Villegas] restrained," Fender called for more help. (Doc 50-1 at 39–40.)

It was at this juncture—with Villegas resisting—that the officers waived the nurses out of the room. (Doc. 51-1 at 64, 152.) The nurses quickly left the dayroom. Spencer explained that this was a "typical" safety procedure during a use of force incident. (Doc. 51-5 at 76; Doc. 47-1 at 126.)

In response to Fender's call, more officers arrived, including Donald Foster, Anildat Amrit, Alan Perrotta, Scott Ake, and Lieutenant Milton Gass. (Doc. 56-1 at 26; Doc. 47-1 at 28.) Gass took over as officer in charge. Using a tether, the officers moved the handcuffs from Villegas's front to his back to fully restrain his arms. (Doc. 57-1 at 77.) Foster helped hold down Villegas's legs and secure the leg restraints. (Doc. 56-1 at 28.) Fender was "trying to hold [Villegas] down." (Doc. 50-1 at 124.) Perrotta was helping by putting his knee and body weight on Villegas's back "in an effort to stop him from fighting." (Doc. 59-1 at 45; Doc. 47-1 at 31.) All told, as many as seven officers were pushing down simultaneously on Villegas. For much of this time, Villegas was on his stomach, restricting his ability to breath. (Doc. 51-5 at 82.)

While this process was ongoing, Major Shawn Lee, Captain James Disano, and Assistant Warden Michael Mashburn arrived. They observed but they did not participate or assume command. (Doc. 59-1 at 133–134.)

A few minutes later, the officers secured the restraints, and Gass cried out "hands on legs on!" (Doc. 50-1 at 128.) With the restraints in place, Villegas quickly "ceased his combative behavior [and] all force ceased." (Doc. 56-1 at 38.) The struggle had lasted approximately twenty-two minutes. (Doc. 61 at 10; Doc. 59-1 at 109.) At Gass's direction, the officers applied a spit shield so that Villegas could not again attempt to bite or spit at the officers. (Doc. 50-1 at 128–30; Doc. 51-5 at 128–29.)

The officers then lifted Villegas and leaned him against a table. Villegas was not combative and was not resisting. (Doc. 56-1 at 38–39.) Nevertheless, because of Villegas's size and "the violence that[ just] occurred," (Doc. 59-1 at 105), Smith, Perrotta, and Tifft kept their hands on Villegas, (Doc. 47-1 at 103). At this point, Villegas's movements come into better view on the video recordings—though his back is turned and several officers pass between Villegas and the cameras.

No one checked Villegas for a pulse or called for the nurses to reenter the room at this time. (Doc. 57-1 at 58–59; Doc. 47-1 at 34–35.) For that reason, Villegas's exact condition is unknown. Based on the videos, he was motionless with his head down. Though Foster did not know whether Villegas was conscious, he thought Villegas "looked

like he [had] passed out."[3] (Doc. 56-1 at 29.) That said, Villegas's coloring was normal and did not indicate medical distress. (Doc. 59-1 at 109–110, 110; Doc. 49-2 at 19, 109.) Villegas did not answer an officer who addressed him. (Doc. 56-1 at 42.) Several officers observed Villegas breathing. (Doc. 52-1 at 83–85; Doc. 56-1 at 39; Doc. 59-1 at 106, 110; Doc. 49-1 at 63; Doc. 49-2 at 57.) Gass thought Villegas's breathing was labored and found this concerning. (Doc. 52-1 at 88–89.) Based on Villegas's erratic behavior, he also thought Villegas might be on drugs, possibly K2. (*Id.* at 241.)

FDOC's use of force policy stated that "[a]ppropriate medical treatment shall be provided immediately" after a use of force. (Doc. 75-6 at 15.) Although arguably inconsistent with the policy, standard practice at Lake Correctional was to take an inmate to a medical treatment room following a use of force, rather than to provide care onsite. For example, Foster believed taking inmates to the nearest medical treatment room "was the procedure after use of force" unless the inmate was not breathing. (Doc. 56-1 at 50, 85–86.) Smith, Fender, Lee, Ake, Perrotta, Amrit, McBride, Disano, and Gass thought

---

[3] There is evidence to the contrary. For example, Gass saw Villegas look him in the eye. (Doc. 52-1 at 88–91.) Lee says Villegas's head position showed that he was conscious. (Doc. 59-1 at 106, 110.) Lee, Smith, and Ake believe that Villegas assisted the officers placing him in the wheelchair. (Doc. 57-1 at 44–46; Doc. 59-1 at 63, 103; Doc. 49-2 at 63–65.)

So too, it is possible to draw a different inference from Villegas's lack of movement than Foster does. For example, Smith attributed Villegas's quiescence to the recent struggle, saying "he was just as tired as we [were] at that point." (Doc. 57-1 at 46–47; Doc. 59-1 at 109.) Because Villegas's condition is disputed, the Court assumes for purposes of this motion the version most favorable to Plaintiff: Villegas was not moving with his head down, perhaps unconscious, and having labored breathing.

so too. (Doc. 57-1 at 91, 98–101; Doc. 59-1 at 29, 119; Doc. 50-1 at 64; Doc. 49-1 at 47; Doc. 47-1 at 128; Doc. 47-5 at 34, 39; Doc. 53-7 at 33; Doc. 48-2 at 12, 37; Doc. 52-1 at 26.) Smith explained that "we always took them in there because like everything was provided there," such as "medical supplies, everything that nurses would need there." (Doc. 57-1 at 99.) Disano added that inmates "don't get assessed at the scene because they can become violent again." (Doc. 48-2 at 56.) Lee clarified that, if "the inmate could not be moved to the treatment room," like in the case of a medical emergency, treatment would be provided at the scene of the use of force. (Doc. 59-1 at 30; Doc. 52-7 at 55.)

The officers here followed the established custom instead of the written policy; rather than assess or treat Villegas in E-dorm, they took Villegas to F-dorm, a nearby building with a medical treatment room. (Doc. 56-1 at 17, 51.) Gass, who was concerned by Villegas's breathing, thought the treatment room was the best place to take Villegas because they had oxygen there. (Doc. 52-1 at 88–89.)

The officers lifted Villegas into a wheelchair. (Doc. 56-1 at 17, 28, 51.) As he lifted Villegas, Ake recalls hearing Villegas breathing heavily, like "being out of breath from fighting." (Doc. 49-2 at 66–67.) Gass told the officers to place Villegas's arms behind the chair's back "so that he doesn't fall out." (Doc. 50-1 at 142–43.) This was standard procedure for inmates in a wheelchair. (Doc. 47-1 at 109; Doc. 47-5 at 85.) Fender also

took it as a precaution "[j]ust in case the inmate became combative again and jumped out of the wheelchair." (Doc. 50-1 at 143.)

Once in the wheelchair, Villegas vomited. (Doc. 56-1 at 28.) Foster believed Villegas had "passed out" but saw that he "was still breathing" by the rise and fall of his chest as he sat in the wheelchair. (*Id.* at 29–30.) Lee also noticed Villegas's breathing. (Doc. 59-1 at 57.) Based on his observations of Villegas's breathing, skin tone, and head position, Lee "did not see anything that would lead [him] to believe" that Villegas needed immediate medical attention. (*Id.* at 55–58, 65, 111.) Ake made the same conclusion. (Doc. 49-2 at 19.)

As the officers wheeled Villegas to F-dorm, they placed their hands on Villegas's head and shoulders. Although Villegas appeared calm, Fischer believed that the officers were "being cautious that he doesn't rise up and try something." (Doc. 51-1 at 72.) It was also standard practice for officers to keep a hold on inmates in a wheelchair. (Doc. 47-1 at 109.) In this case, however, the downward pressure on Villegas's head and shoulders may have constricted his airway and restricted his body's ability to circulate blood. (Doc. 77-1 at 65–66; Doc. 75-2 at 25.)

Immediately outside of the dayroom, the officers stopped to replace Villegas's spit shield because they noticed the first one had torn. (Doc. 57-1 at 57; Doc. 48-3 at 13.)

Disano heard Villegas moan when McBride put on the new shield.[4] (Doc. 48-2 at 15.) Lee and Amrit observed the rise and fall of Villegas's chest, indicating that he was breathing. (Doc. 59-1 at 110–11, 122–23; Doc. 47-5 at 73, 77, 86.) Resuming their walk, the officers passed the nurses, who had been waiting just outside the dayroom. (Doc. 56-1 at 45.) The officers did not stop to allow the nurses to assess Villegas. (*Id.* at 45–46.)

On the way to F-dorm, Villegas's head was down and he "appeared completely unresponsive. He was not moving." (Doc. 51-1 at 23, 89; Doc. 56-1 at 56.) In contrast, the officers moved quickly, (Doc. 51-1 at 87), not stopping to test if Villegas would respond to questions, (Doc. 50-1 at 80, 149). Fender and Foster saw Villegas breathing on the way to F-dorm. (Doc. 56-1 at 34; Doc. 50-1 at 78–79.) Fender described his breathing as "heavy" and consistent with the extended struggle that had just concluded. (Doc. 50-1 at 80.) Ake, meanwhile, remembers that, about halfway to F-dorm, he saw Villegas slump and go "limp." (Doc. 49-1 at 82.) At about this time, Disano took command and Gass and Smith were relieved. (Doc. 57-1 at 68; Doc. 48-1 at 30–31.)

Upon arrival at F-dorm, the officers took Villegas to the medical treatment room. It was a small room furnished with medical equipment, a few cabinets, and a table. A nurse (either Fischer or Spencer) quickly discovered that Villegas was not breathing. Nor could

---

[4] Smith and Fender heard Villegas say something about not wanting to wear the shield, though Fender cannot remember if he heard it at the sally port or in E-dorm. (Doc. 57-1 at 54; Doc. 50-1 at 72–73, 76, 130.) However, this is inconsistent with Foster's testimony that Villegas had "passed out." (Doc. 56-1 at 29–30.)

11

she find a pulse. (Doc. 51-1 at 93.) The officers removed the handcuffs and laid Villegas on the floor. The nurses and officers "immediately started CPR." (*Id.*) This was seven to ten minutes after Villegas had stopped resisting in E-dorm. (Doc. 56-1 at 133; Doc. 50-1 at 107.) They continued applying CPR until Lake County EMTs arrived. The EMTs moved Villegas to South Lake Hospital where he was pronounced dead.

After an autopsy, Dr. Wendy Lavezzi concluded that Villegas's death was a homicide, meaning "death as a result of an intentional act by another human being." (Doc. 54-1 at 25–26.) Although Villegas had no broken bones, rib fractures, or crush damage to his trachea, Lavezzi found pinpoint hemorrhages on Villegas shoulders and back, indicating that pressure on his body had inhibited the return of blood to his heart. (*Id.* at 30–32, 46–47, 54.) Dr. Hughes also found hemorrhages that were consistent with "extreme presume being placed on [Villegas's] back." (Doc. 77-1 at 91, 95.) Lavezzi confirmed that K2 was in Villegas's system at the time of death, (Doc. 54-1 at 43), and she noted that K2 caused or contributed to Villegas's excited delirium, (*id.* at 9, 42). Villegas's ultimate cause of death was restraint asphyxia, with excited delirium as a contributing condition. (Doc. 54-4 at 1.)

Plaintiff, acting as the representative of Villegas's estate, filed this action in the Fifth Judicial Circuit in and for Lake County, Florida. Defendants timely removed to federal court. (Doc. 1.) All Defendants except Mashburn filed a joint motion for summary

judgment. (Doc. 61.) Mashburn filed a separate motion for summary judgment on Count

IV. (Doc. 62.) After Plaintiff's responses, (Doc. 73; Doc. 74), and Defendants' replies,

(Doc. 81; Doc. 82), the Magistrate Judge issued a Report and Recommendation, (Doc.

83), submitting that summary judgment should be denied with two exceptions. First,

summary judgment should be granted as to Defendants Amrit and Warden Sheila Cumbie

because Plaintiff did not oppose it. And second, the Magistrate Judge recommended

granting partial summary judgment on Count IV, to the extent it alleged supervisory

liability for a failure to train or enact policies related to K2. Defendants objected to the

Magistrate Judge's recommendation. (Doc. 87; Doc. 88.) Plaintiff—who did not object—

responded in opposition to Defendants' objections. (Doc. 90; Doc. 91.) The Court held

oral argument on January 28, 2022. (Doc. 95.)

## II.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute of material fact and

the moving party is entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(a). A

fact is material if it might affect the outcome of the suit under governing law. *See Anderson*

*v. Liberty Lobby, In*c., 477 U.S. 242, 248 (1986).

A moving party is entitled to summary judgment when the nonmoving party "fail[s]

to make a sufficient showing on an essential element of her case with respect to which she

has the burden of proof." *Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant

13

bears the initial burden of informing the court of the basis for its motion and identifying those parts of the record that show an absence of a genuine issue of fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When that burden is met, the burden shifts to the nonmovant to prove that there is a genuine issue of fact that precludes summary judgment. *Id.* The nonmoving party must "go beyond the pleadings" and point to evidence of a real issue for trial. *Celotex*, 477 U.S. at 324 (quotation omitted). When other evidence is clearly contradicted by a video recording, the Court must view the evidence in the light depicted by the video. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007). But "[s]ummary judgment is not a time for fact-factfinding" or credibility determinations. *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020). Those tasks are "reserved for trial." *Id.* Instead, the Court reviews all the evidence and draws all legitimate inferences in the nonmoving party's favor.[5] *See id.* at 1262.

After review of a magistrate judge's report and recommendation on a motion for summary judgment, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see*

---

[5] The Court construes the Magistrate Judge's recommendation in the light of this legal standard. To the extent the Magistrate Judge's language is ambiguous or refers to "crediting" Plaintiff's version of events, a holistic reading shows that the Magistrate Judge was not finding facts or making credibility determinations. Instead, the Magistrate Judge used shorthand for the rule at summary judgment that, "when conflicts arise between the facts evidenced by the parties, [the court] credit[s] the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (emphasis omitted).

Fed. R. Civ. P. 72(b). The court must review anew any portion of the recommendation to which a party files a timely and specific objection. *See* § 636(b)(1)(C). Because a magistrate judge "has no authority to make a final and binding disposition" of a dispositive motion, *United States v. Raddatz*, 447 U.S. 667, 673 (1980), the district court must review legal conclusions de novo, even in the absence of an objection. *See Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 604 (11th Cir. 1994); *Ashworth v. Glades Cnty. Bd. of Cnty. Comm'rs*, 379 F. Supp. 3d 1244, 1246 (M.D. Fla. 2019) (Steele, J.).

## III.   ANALYSIS

The operative Complaint asserts state and federal claims that stem from Villegas's death. (Doc. 26.) In Count I, Plaintiff alleges that the Florida Department of Corrections (FDOC) and Warden Cumbie are liable for negligence under Florida's wrongful death statute. In Counts II and III, Plaintiff alleges that Defendants Gass, Key, Fender, Ake, Amrit, McBride, Smith, Tifft, Perrotta, and Foster violated the Eighth Amendment by using excessive force and by exhibiting deliberate indifference to Villegas's serious medical needs. In Count IV, Plaintiff alleges that Defendants Gass, Disano, Lee, and Mashburn have supervisory liability for the constitutional violations in Counts II and III. Plaintiff brings Counts II, III, and IV under 42 U.S.C. § 1983.

Plaintiff does not object to Amrit's motion for summary judgment on the claim against him in Counts II and III. (Doc. 73 at 31 n.9, 35.) The Magistrate Judge

recommended granting Amrit summary judgment, and no party objected. This Court agrees with the Magistrate Judge, adopts the relevant reasoning in the Report and Recommendation, and grants summary judgment to Amrit.[6]

As to the remaining claims, the Court analyzes the motions de novo because whether Defendants are entitled to summary judgment is a pure question of law.[7] *See Sconiers*, 946 F.3d at 1263 (explaining that factual determinations are not appropriate at summary judgment). The Court will first discuss the federal claims for excessive force, deliberate indifference, and supervisor liability through 42 U.S.C. § 1983, before turning to the Florida wrongful death claim.

---

[6] Plaintiff also does not object to Cumbie's motion for summary judgment on the claim against her in Count I. (Doc. 73 at 30 n.7.) But since the Court does not reach the state law claim, it does not rule on Cumbie's motion.

[7] At oral argument, Plaintiff submitted that de novo review of the Magistrate Judge's recommendation was inappropriate because Defendants' objections are narrow and fail to specifically attack the ultimate legal determinations recommended by the Magistrate Judge. (Doc. 95; Doc. 90 at 2–3.) The Court disagrees on the scope of Defendants' objections, concluding that the objections, fairly considered together, object to essential portions of the recommendation on each of the federal claims. Regardless, de novo review at the summary judgment stage is proper because the recommendations are, by definition, legal ones. While 28 U.S.C. § 636(b) requires district courts to review objections de novo, it otherwise gives "the widest discretion on how to treat recommendations of the magistrate." *Raddatz*, 447 U.S. at 675 (quotation omitted). Thus, while courts are not required to do so, they "may" "reject, or modify, in whole or in part, the findings or recommendations," regardless of objection. § 636(b)(1). The weight to accord the magistrate judge's recommendation is in "the sound discretion" of the court, but the court itself must make the "ultimate decision" on the merits of a dispositive motion. *Jean-Baptiste v. Gutierrez*, 680 F. Supp. 2d 1318, 1322 (S.D. Fla.) (Gold, J.) (quoting *Raddatz*, 477 U.S. at 683), *rev'd on other grounds*, 627 F.3d 816 (11th Cir. 2010). For that reason, a court must review a magistrate judge's legal conclusions de novo, even without an objection. *See Cooper-Houston*, 37 F.3d at 604; *LeCroy v. McNeil*, 397 F. App'x 554, 556 (11th Cir. 2010) (per curiam). And, of course, factual findings are not a judicial function at summary judgment. *See Heron Dev. Corp. v. Vacation Tours, Inc.*, 814 F. App'x 468, 472–73 (11th Cir. 2020) (per curiam) (adopting a magistrate judge's findings of fact at summary judgment was reversable error).

16

### A. Excessive Force under the Eighth Amendment

The Eighth Amendment prohibits a use of force that amounts to an "unnecessary and wanton infliction of pain." *Whitley*, 475 U.S. at 320. An excessive force claim has objective and subjective elements. A plaintiff must show that the force was objectively "sufficiently serious," *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), and that it was applied "sadistically and maliciously," or for the subjective "purpose of causing harm," *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002). Put simply, the court "must determine whether the evidence, when viewed in the light most favorable to the non-moving party, supports a reasonable inference that the prison official acted wantonly in inflicting pain." *Sears v. Warden Okeechobee Corr. Inst.*, 762 F. App'x 910, 915 (11th Cir. 2019) (per curiam).

Plaintiff claims that Defendants Gass, Key, Fender, Ake, Amrit, McBride, Smith, Tifft, Perrotta, and Foster used constitutionally excessive force when they restrained Villegas and when they moved him to F-dorm for medical treatment. Because Defendants assert qualified immunity and there is no dispute that they were acting within their discretionary functions, Plaintiff bears the burden of proving that Defendants used excessive force. *See Patel v. Lanier Cnty.*, 969 F.3d 1173, 1185 (11th Cir. 2020).[8]

---

[8] Under Eleventh Circuit precedent, if a plaintiff points to sufficient evidence of excessive force in violation of the Eighth Amendment, he need not show that the conduct was clearly established as unconstitutional. *See Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) ("There is simply no room for a qualified

### 1. The Use of Force Incident

To survive summary judgment on his claim that Defendants violated the Eighth Amendment when they tried to restrain Villegas over approximately 20 minutes, Plaintiff must prove both the objective and subjective elements of an excessive force claim.

The objective element requires that the officers' actions were "harmful enough," *Hudson*, 503 U.S. at 8 (quotation omitted), or "sufficiently serious," *Wilson*, 501 U.S. at

---

immunity defense when the plaintiff alleges such a violation. The only question, then, is whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or a motion for summary judgment.").

This rule is in some tension with the Supreme Court's instructions. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (reasoning that defendants who used excessive force in violation of the Eighth Amendment "may nevertheless be shielded from liability" if they "did not violate 'clearly established [law].'" (quotation omitted)). First, *Skrtich* collapses the two-prong qualified immunity inquiry into whether the plaintiff proves a constitutional violation. Yet the Supreme Court says that the clearly established prong is "completely separate from the merits." *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014). Second, *Skrtich* assumes that all Eighth Amendment excessive force cases are so similar that no court need ever consider whether the law is clearly established as applied to the particular facts. But the Supreme Court says that the clearly-established-law inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quotation omitted). *Skrtich* itself—when reviewing the district court's analysis—concluded that a reasonable officer would know that "gratuitous force against a [subdued] prisoner" was impermissible. *Skrtich*, 280 F.3d at 1303. That framing is slightly more tailored than the generic Eighth Amendment ban on "wanton" or "malicious" force. Indeed, it sounds like a broad principle that may control the novel facts of a case. *See Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) (per curiam) (explaining that "it must be obvious that the general rule applies to the specific situation in question"). And yet, *Skrtich*'s rule that there is "no room for a qualified immunity defense," *Skrtich*, 280 F.3d at 1301, turns the Eighth Amendment excessive force standard into a right defined "at a high level of generality," which "avoids the crucial question" of whether "the right's contours were sufficiently definite" to inform "any reasonable official in the defendant's shoes" that "he was violating it." *Plumhoff*, 572 U.S. at 778–79 (quotation omitted).

The real-world problem with *Skrtich*'s no-need-for-clearly-established-law rule is lack of notice to an officer that his efforts to maintain prison security in the face of an inmate's unpredictable aggression may be deemed unconstitutional. Stated otherwise, a jury may—based on circumstantial evidence—find force "malicious" but that does not mean it is clearly established to all reasonable officers that the conduct necessarily is so. *Id.* at 779 (explaining that the point of the "clearly established" requirement is to make the "constitutional question" "beyond debate" (quotation omitted)).

298. That portion is satisfied because Defendants used their weight to restrain Villegas for an extended period and they do not contest that this force either caused or contributed to his death. This is not the sort of de minimis force that is excluded from the Eighth Amendment's protection.

The subjective component is the "core judicial inquiry" in an Eighth Amendment excessive force case. *Hudson*, 503 U.S. at 7. It asks whether the force was "applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* To answer that question, courts consider (1) the need for force; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of the injury inflicted"; (4) "the threat to the safety of staff and inmates"; and (5) "any efforts made to temper the severity" of the force. *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (quotations omitted). In weighing these factors, courts "must also give 'a wide range of deference to prison officials acting to preserve discipline and security,'" especially for decisions made "at the scene of a disturbance." *Id.* (quoting *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)). In addition to affirmative malfeasance, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002).

Defendants argue that Plaintiff identifies no evidence that they acted maliciously. Plaintiff responds that the videos allow a reasonable jury to infer that Villegas was unconscious for an extended period after he was subdued but before reaching the medical treatment unit,[9] and thus, the Defendants restrained Villegas without legitimate reason. And if they restrained him for no reason, one could assume it was for a malicious or sadistic purpose. The Magistrate Judge agreed, finding the videos created a dispute of fact.

But the videos do not bear the weight Plaintiff places upon them, as Villegas's movements are largely obstructed by the officers' attempts to subdue him. As Plaintiff's experts acknowledge, the handheld video shows that Villegas is moving and resisting while he is in the cell. (Doc. 54-1 at 47–48; Doc. 75-2 at 19.) The videos also show that, once Defendants pulled Villegas out of the cell, he continued resisting. (Doc. 54-1 at 47–48, 67–68; Doc. 75-2 at 19; Doc. 75-1 at 77, 79; Doc. 76-1 at 14.) At various points, the videos also reveal Villegas's feet moving and Defendants struggling to move Villegas's arms. Beyond that, the videos are inconclusive on the extent and timing of Villegas's resistance or lack thereof. (Doc. 54-1 at 48, 68; Doc. 76-1 at 12.) They certainly do not show that Villegas was unresponsive or unconscious for an extended period during the struggle, as

---

[9] At oral argument, Plaintiff clarified his position: he raises no excessive force claim prior to the time when the officers restrained Villegas's arms behind his back and an officer yelled out "hands on, legs on!" (Doc. 77 at 118.) Count II's allegation of excessive force is limited to the period after Villegas was fully restrained. Thus, much of the struggle does not form the basis of his excessive force claim, although it may be considered in context as to how the officers responded during the time at issue.

20

Plaintiff contends. (Doc. 77-1 at 124 (explaining that, accordingly to Plaintiff's expert Dr. Hughes, Villegas was moving just prior to being fully secured).)

With the videos showing very little of Villegas, they do not dispute the uniform testimony of Defendants that Villegas resisted until just after Defendants restrained his arms behind his back. Instead, since the videos show resistance at various points, they tend to support Defendants' testimony. Thus, the videos neither show that the force was unnecessary nor that it was applied "maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (quotation omitted). Nor could a reasonable jury infer that it was from the videos. To do so, a jury would have to engage in "speculation and conjecture" about what is obstructed from the cameras' view, "render[ing] its finding a guess or mere possibility," rather than a legitimate inference "based on the evidence." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982); *see also Donnelly v. Wal-Mart Stores E., LP*, 844 F. App'x 164, 169 (11th Cir. 2021) (per curiam) (concluding that a plaintiff's argument that a jury could infer from a video that store employees knew of a spill was "pure speculation, which [was] not enough to survive a summary judgment motion"); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment." (quotation omitted)).

The other evidence Plaintiff points to as support that the force was applied "maliciously and sadistically to cause harm" is the extent of injury. *Wilkins*, 559 U.S. at 37 (quotation omitted). But this is only one factor (of five) in the totality of the circumstances analysis necessary to a conclusion that a use of force was constitutionally excessive. *See Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2240–41 (2021) (per curiam). The Court now undertakes that inquiry.

To be constitutionally excessive, the plaintiff must show that the perpetrator had a "sufficiently culpable state of mind." *Hudson*, 503 U.S. at 8 (quoting *Wilson*, 501 U.S. at 298). This contrasts with force applied as "a good-faith effort to maintain or restore discipline." *Id.* at 7. While the totality of the circumstances is relevant, five factors guide the analysis. In weighing these factors, courts "must also give 'a wide range of deference to prison officials acting to preserve discipline and security.'" *Cockrell*, 510 F.3d at 1311 (quoting *Bennett*, 898 F.2d at 1533). Here, these factors would not permit a reasonable jury to conclude that Defendants acted with a malicious or sadistic intent. Accordingly, they are entitled to summary judgment on the Eighth Amendment excessive force claim.

Under the first and second factors, courts consider whether there was a need for the force and whether the force actually applied was proportional to that need. *See Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019). These factors point in Defendants' favor.

The need for force was clear. And, although the Plaintiff's briefing suggests otherwise, he now concedes that to be true up until Villegas's arms were restrained behind his back. *See supra* fn. 9. When Defendants tried to rouse Villegas, he responded violently, attempting to strike, bite, kick, and spit at the officers. As nurse Fischer put it, Villegas "was absolutely resisting." (Doc. 51-1 at 149.) And Villegas refused to comply with orders to stop. Thus, the "need for the use of force [was] established by the undisputed evidence that [the prisoner] created a disturbance." *Bennett*, 898 F.2d at 1533; *see Brown v. Smith*, 813 F.2d 1187, 1189 (11th Cir. 1987) (resisting officers justifies force to "compel compliance" and ensure security). The four or five officers in the cell were unable to restrain him, so it "was not unreasonable for [them] to believe that [Villegas] posed a substantial threat to the safety of the officers around him." *Fennell v. Gilstrap*, 559 F.3d 1212, 1219 (11th Cir. 2009). Accordingly, the officers needed to use force to restrain Villegas. *See Miles v. Jackson*, 757 F. App'x 828, 830 (11th Cir. 2018) (per curiam) (concluding there was a need for force because the inmate failed to comply with orders and evaded attempts to require compliance); *Skrtich*, 280 F.3d at 1301–02 (accepting an inmate's concession that using an electric shield to incapacitate him was lawful in the light of his non-compliance).

The force applied was also proportional to that need. Villegas was a large man, weighing 275 pounds at five feet eight inches tall. (Doc. 54-1 at 29; Doc. 54-4 at 3.)

Villegas also displayed exceptional strength. (Doc. 75-1 at 77; Doc. 51-1 at 66–67 (Fisher described Villegas as exhibiting "super-human strength" or the "strength of a grizzly bear.").) At times, five officers were not able to hold him down. Perhaps Villegas's unusual strength was due to the stimulant effects of K2, which an autopsy found within his system. (Doc. 54-1 at 43.) Dr. Lavezzi explained that extreme strength is not an uncommon reaction to K2 and other stimulant drugs. (*Id.* at 68.) Regardless of the cause, Villegas struggled mightily.[10] (*Id.*) In response, the officers used the force necessary to restrain him. As Dr. Lavezzi explained, "it would certainly be difficult" to restrain an inmate on K2. (*Id.* at 69.)

There is no admissible evidence that Defendants intentionally increased their force to cause pain or suffering.[11] Defendants did not attack with weapons, kick, or strike Villegas. *Cf. Skrtich*, 280 F.3d at 1299–1300 (guards continued kicking an inmate after an electric shock incapacitated him). Nor did they taunt him or express a desire to punish him,

---

[10] Contrary to Plaintiff's claims, the videos do not dispute this conclusion. They do not "blatantly" contradict the account Defendants and Fischer provide in their depositions of Villegas's conduct. *Scott*, 550 U.S. at 380. As Dr. Lavezzi, Aubrey Land, and Dr. Hughes agree, the video is inconclusive on whether Villegas was resisting in the moments before Defendants resecured Villegas's restraints. (Doc. 54-1 at 47–48; Doc. 76-1 at 8, 12; Doc. 77-1 at 52, 55–56, 93.) Since the videos do not contradict the deposition testimony and that testimony agrees that Villegas resisted until he was properly restrained, there is no dispute on this point. *See Fennell*, 559 F.3d at 1220 (finding video evidence of an alleged incident of excessive force did not contract the officers' account of the struggle). As noted earlier, Plaintiff would be asking a jury to speculate as to Villegas's lack of resistance up to that point based on the videos, which is an improper inference.

[11] For example, Fischer notes that, based on her vantage point at the time and her review of the videos, she did not notice Defendants act inappropriately or maliciously. (Doc. 51-1 at 66–67, 148, 153.) Instead, she thought "that the situation was very grim" and that Defendants "did the best they could." (*Id.* at 117.)

a common indicator of malintent. *Cf. Bozeman v. Orum*, 422 F.3d 1265, 1271–72 (11th Cir. 2005) (per curiam) (after a detainee attempted to surrender, officers said "we don't think you've had enough"), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Nor did they ignore Villegas's attempts to surrender or expressions of pain. *Cf. Lombardo*, 141 S. Ct. at 2240–41 (officers ignored detainee's cries of pain and his request for them to stop). Instead, Defendants continually called for Villegas to stop resisting and ceased their use of force immediately after Gass called out "hands on, legs on," which was the signal that Villegas was finally fully secured. (Doc. 77-1 at 118, 124.)

And even if—as Plaintiff claims—Villegas stopped resisting before Defendants released him, that alone would not be determinative. It "is not the law" that "prison officials [must] release from restraint a dangerous inmate who has lashed out at them simply because he has stopped lashing out for the time being." *Scroggins v. Davis*, 346 F. App'x 504, 506 (11th Cir. 2009) (per curiam). Instead, so long as they act in a "good faith effort to maintain or restore discipline," *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999), prison staff are entitled to "great deference" in their decisions to "apply[] prophylactic or preventative measures intended to reduce the incidence of riots and other breaches of prison discipline," *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991).

Aubrey Land, one of Plaintiff's experts, argues that Defendants should not have used a tether in their attempts to move Villegas's cuffs from front-to-back and that doing

25

so was excessive force. Land does not argue that moving the cuff behind Villegas's back was an unworthy goal; he acknowledges that "mov[ing] the handcuffs was for the safety of staff and Villegas." (Doc. 76-1 at 8.) Instead, Land takes issue with Defendants' method. He suggests that Defendants could have made an improvised belly chain, which he submits would have been a quicker and more efficient tactic, thus eliminating the need for some of the force exerted. (Doc. 75-1 at 76–81.) Land concludes that, since the force was more prolonged than it needed to be, the force was excessive.[12] But a "prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319. Indeed, "a mere dispute over" the "existence of arguably superior alternatives" is not enough to support a claim of excessive force in a confinement setting. *Campbell*, 169 F.3d at 1375 (quoting *Whitley*, 475 U.S. at 322). Thus, Land's suggestion fails because it ignores the "wide range of deference" courts must give to "prison officials acting to preserve discipline and security," *Bennett*, 898 F.2d at 1533, and lacks the "appropriate hesitancy to critique

---

[12] Land's opinion that Defendants used excessive force does not create an issue of fact barring summary judgment because it a legal conclusion on an ultimate question reserved for the jury and thus not properly within the scope of expert testimony. (*See* Doc. 75-2 at 25 ("It is my professional opinion the staff members involved in the use of force utilized excessive force against Inmate Villegas."); *see Myer v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (first citing *Scott*, 550 U.S. at 381 n.8; and then citing *Freund v. Butterworth*, 165 F.3d 839, 863 n.34 (11th Cir. 1999) (en banc)). The Court does not consider evidence at the summary judgment stage that it would not permit to be presented to a jury, and the Court would exclude this portion of Land's opinion at trial.

in hindsight decisions [that prison officials] necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley*, 475 U.S. at 320. In the end, even if another method of front-to-back securing of Villegas's hands was feasible given the situation, the second factor inquires about the *relationship* between the need and amount of force used—Land does not contest the need and takes issue with the somewhat incremental length of time added by using a tether instead of a makeshift belly chain. A reasonable jury could not conclude that this factor carries the day to establish "sadistic" or "malicious" intent to cause harm, and the Court doubts a reasonable jury could even conclude that this factor weighs in Plaintiff's favor at all.

The third factor is the extent of the injury inflicted. *See Cockrell*, 510 F.3d at 1311. The significance of this factor is that "injuries can be an indicator, however imperfect, of the severity of the force that caused them." *Patel*, 969 F.3d at 1184. Accordingly, the Supreme Court has instructed courts to "to decide [Eighth Amendment] excessive force claims based on the nature of the force rather than the extent of the injury." *Wilkins*, 559 U.S. at 34.

Here, Villegas suffered extreme injury. Dr. Lavezzi identifies the cause of death as restraint asphyxia with exited delirium as a contributing condition. (Doc. 54-4 at 1.) The former is a "lack of oxygenated blood going to [the] brain." (Doc. 54-1 at 57.) Lavezzi explained that the asphyxia likely resulted from Villegas's position on his stomach, which

restricted his ability to oxygenate blood, and the pressure on his back and shoulders that inhibited the return of blood. (*Id.* at 46–47, 57.) The excited delirium resulted from the K2 metabolizing in Villegas's system and the extended struggle with Defendants. (*Id.* at 9, 46–47.) Because these injuries show that Defendants used significant force, this factor weighs in Plaintiff's favor. Defendants (rightly) do not dispute that.

The fourth factor is the "extent of the threat to the safety of staff and inmates." *Cockrell*, 510 F.3d at 1311 (quotation omitted). This factor is based on the threat evident in the "particular situation" at issue. *Hudson*, 503 U.S. at 7; *cf. Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The [situation] must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). This factor points in Defendants' favor.

Based on Villegas's resistance and (at least initial) violence, Defendants perceived a significant threat to order and safety. *See Miles*, 757 F. App'x at 830 (reasoning that an inmate's aggression and violent history increased the threat the officers perceived); *see also Scott v. Crosby*, No. 3:19-cv-4746, 2021 WL 667002, at *5 (concluding that "Defendants reasonably perceived Plaintiff's physical resistance to their commands and subsequent attempt to escape their custodial holds as a threat"), *report and recommendation adopted*, 2021 WL 662299 (N.D. Fla. Feb. 19, 2021) (Collier, J.) . Villegas was "actively combative,"

(Doc. 51-1 at 141, 151), attempting to kick, bite, and strike Defendants, (Doc. 50-6 at 6; Doc. 47-1 at 38).

Plus, at least some Defendants knew or suspected that Villegas was on K2. (Doc. 57-1 at 28.) It is "not unusual" for inmates on K2 to be "combative," or to "go from unresponsive and sluggish to very combative." (Doc. 51-5 at 47; Doc. 57-1 at 26; Doc. 59-1 at 21.) Thus, K2 increases the threat as Defendants perceived it in at least two ways. First, it increases the danger. The officers knew that K2 causes some inmates to be stronger and more violent than usual. Second, it increases the risk of sudden and unexplained shifts in behavior. The officers rightfully suspected that K2 might lead Villegas to be "unpredictable" or irrationally violent. (Doc. 57-1 at 26.) After all, Defendants knew that, just minutes earlier, Villegas was "unresponsive one moment, then he became combative" for an extended period. (*Id.* at 28.) Such swings were not uncommon with K2. (Doc. 47-1 at 78.) As one Defendant explained, "[Y]ou can't assume he's not going to do it again." (Doc. 57-1 at 51.) All told, the potential that Villegas was on K2 increased the threat to the officers, inmates, and staff.

The fifth factor is whether Defendants tried "to temper the severity of a forceful response." *Cockrell*, 510 F.3d at 1311 (quotation omitted). Under this factor, courts consider efforts to provide medical treatment. If officers "immediately summoned medical assistance for [an] injured inmate," that is "strong evidence that there was no malicious and

sadistic purpose in the use of force." *Fennell*, 559 F.3d at 1220. But an officer fails to "temper the severity" of force when he denies medical treatment for an extended period, thus compounding the harmful effect of the force. *See Danley v. Allen*, 540 F.3d 1298, 1310 (11th Cir. 2008) (reasoning that officers failed to temper effect of pepper spraying inmate because they stopped him from cleaning off the spray for 20 minutes). This factor points toward a tempered response.

The encounter began with Defendants discovering an unresponsive Villegas in his cell. They immediately called for medical personnel, *see Fennell*, 559 F.3d at 1220 (summoning nurses is a sign of tempered force), but had to waive the responding nurses out of the room when Villegas became combative. While waiting for the nurses to arrive, Defendants entered the cell to assess Villegas's condition. Seeing labored breathing and signs of recent vomiting, Defendants put Villegas in a recovery position "to give [him] a proper clear airway." (Doc. 57-1 at 36.) As Fender was trained, (*id.* at 32), he aroused Villegas using a sternum rub, (*id.* at 37). So too, the encounter ended with Defendants taking Villegas to receive a medical assessment. *See Brown*, 813 F.2d at 1189 (noting that the inmate was "immediately" taken to the infirmary after the altercation). These efforts to provide medical treatment—though arguably insufficient and ultimately ineffectual—undermine any suggestion of malicious intent and show a tempered use of force.

Considered together, these factors and the totality of the circumstances do not give rise to an inference that Defendants acted maliciously or sadistically. Plaintiff has not pointed to evidence that Defendants taunted Villegas, *cf. Cockrell*, 510 F.3d at 1312 (explaining that "threatening comments are circumstantial evidence of mental state"), beat him after he ceased resisting, *cf. Skrtich*, 280 F.3d at 1302, or expressed a desire to harm him, *cf. Bozeman*, 422 F.3d at 1271. These key facts arose in cases when courts have found the "requisite intent to harm" for excessive force claims. *Barcelona v. Rodriguez*, 847 F. App'x 739, 741 (11th Cir. 2021) (per curiam). After Land reviewed the evidence, he agreed that he "didn't find any evidence" that the officers acted "intentionally to cause punishment." (Doc. 76-1 at 8–9.) In the absence of these signs and upon consideration of the totality of the evidence, the Court concludes that Plaintiff cannot show sufficient evidence from which a reasonable jury could find that Defendants used force maliciously and sadistically to cause harm.

Instead, the evidence shows that Defendants responded to a real threat with a "good faith effort to maintain or restore discipline." *Campbell*, 169 F.3d at 1374 (quotation omitted). Their response might not have been perfect. But "neither judge nor jury [may] freely substitute their judgment for that of [prison] officials who have made a considered choice." *Whitley*, 475 U.S. at 322. Courts must give significant deference to the decisions of prison officials attempting to maintain order. *See Bennett*, 898 F.2d at 1533. As Land

31

explained, Defendants could have done some things differently, but that does not mean "they were unjustified in their use of force, by no means." (Doc. 75-1 at 82.) Instead, "they encountered a situation" and "attempt[ed] to control that situation." (*Id.* at 82.) Since the evidence, "viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain . . ., the case should not go to the jury." *Whitley*, 475 U.S. at 322.

### 2.  Transportation to F-dorm

Plaintiff also alleges that Defendants used excessive force after securing Villegas and when moving him to F-dorm because two to four officers placed their hands on Villegas's shoulders, neck, or head. Defendants disagree. For the same reasons discussed above, Plaintiff fails to establish the subjective component of an excessive force claim. The totality of the facts in the light of the factors discussed above does not "raise an inference that [Defendants] acted wantonly" in their efforts to restrain Villegas during transit. *Moore v. Hunter*, 847 F. App'x 694, 698 (11th Cir. 2021) (per curiam).

Once Villegas stopped resisting, Defendants lifted Villegas in the wheelchair and pushed the wheelchair to F-dorm. While during so, Defendants (including Fender, Smith, and Tifft) put their hands on Villegas's head, neck, shoulders, and arms. Between two and four officers were pushing down on him at any one time. Defendants' downward pressure almost surely impaired to some degree Villegas's circulation or made it more difficult for

32

him to breath by constricting his airway. (Doc. 51-5 at 43–44; Doc. 54-1 at 51–52; Doc. 77-1 at 65–66.)

When an inmate stops resisting, there is additional risk that continued force may be excessive. *See Williams v. Rickman*, 759 F. App'x 849, 853 (11th Cir. 2019) (per curiam). That is so because, when an inmate begins complying, the need for force is reduced or eliminated. *See Warden Okeechobee Corr. Inst.*, 762 F. App'x at 916. Of course, officers need not "release from restraint a dangerous inmate who has lashed out at them simply because he has stopped lashing out for the time being." *Scroggins*, 346 F. App'x at 506. The inquiry remains contextual. *See Lombardo*, 141 S. Ct. at 2240–41 (reversing an appellate court for failing to consider the totality of the circumstances of a Fourth Amendment excessive force claim). It requires deciding whether, under all the circumstances, the officers acted with sadistic motivations. Here, Defendants had good faith reasons for continuing to restrain Villegas by placing their hands on him while he sat in E-dorm and during transit to F-dorm.

Despite the tragic effects here, this "custodial hold"—as Defendants call it, (Doc. 50-1 at 143–44)—was a standard practice for transporting inmates after a use of force, (Doc. 47-1 at 109; Doc. 47-5 at 85). As Disano explained, "it's normal policy that when you use force, you don't relinquish hands on an inmate until they are secured in a cell." (Doc. 48-2 at 195.) While following practice does not diminish the severity of the harm

Villegas suffered, it does tend to negate the suggestion that Defendants inflicted it maliciously. As Lavezzi explained, keeping hands on Villegas was intended "to keep him upright and to keep him from fighting." (Doc. 54-1 at 51.)

Not only was it standard practice, but there were good reasons to apply it in this situation since Villegas had so recently been "violent and out of control." (Doc. 76-1 at 14.) Of course, now Villegas appeared calm, even motionless. But recall that Defendants discovered Villegas unresponsive in his cell. When they attempted to assess his condition (using verbal commands, a recovery position, and a sternum rub), Villegas "immediately began to fight staff." (Doc. 57-1 at 103.) A reasonable officer aware of that context could find it wise to retain hands on the inmate during transport "[j]ust in case the inmate became combative again and jumped out of the wheelchair." (Doc. 50-1 at 143; Doc. 57-1 at 28, 51; Doc. 51-1 at 72; Doc. 48-2 at 120); *cf. Skrtich*, 280 F.3d at 1302 (accepting that an inmate's history of violence may warrant extra precautions). Even drawing all permissible inferences in Plaintiff's favor, the amount of pressure displayed in the videos to hold Villegas in the wheelchair was not so wildly disproportionate to that legitimate prison safety goal. And, of course, prison staff are entitled to "great deference" in such "prophylactic or preventative measures." *Williams*, 943 F.2d at 1576.

Upon review of all the facts, a reasonable jury could not find that Defendants pushed down on Villegas in the wheelchair with "no object but to inflict pain." *Skrtich*, 280 F.3d

at 1304. Nor do they "demonstrate that [the officers] acted maliciously or sadistically." *Moore*, 847 F. App'x at 698. Instead, some continued force was necessary in the light of Villegas's past resistance and the possibility that he might do so again. And despite Villegas's calm, following standard procedure by keeping hands on Villegas was not disproportionate to the threat to order and safety. Thus, because Plaintiff has not proved that Defendants violated the Eighth Amendment's prohibition on excessive force, they are entitled to summary judgment as to Count II.

### B. Deliberate Indifference under the Eighth Amendment

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. The Supreme Court has interpreted this phrase to forbid "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) (quotation omitted). An Eighth Amendment deliberate indifference claim requires a plaintiff to prove that (1) the inmate had an objectively serious medical need; (2) the defendants acted with subjective deliberate indifference; and (3) the defendants' wrongful conduct caused or worsened the inmate's condition. *See Patel*, 969 F.3d at 1188.[13] A plaintiff bears the burden of proving all aspects of the Eighth Amendment claim. *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1274 (11th Cir. 2020) (en banc).

---

[13] As explained in *Patel*, the deliberate indifference standard for pretrial detainees under the Fourteenth Amendment and inmates under the Eighth Amendment is identical. *See Patel*, 969 F.3d at 1188 (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)).

In Count III, Plaintiff alleges that Defendants Gass, Key, Fender, Ake, Amrit, McBride, Smith, Tifft, Perrotta, and Foster violated Villegas's civil rights under § 1983 because they exhibited deliberate indifference to Villegas's medical needs under the Eighth Amendment. (Doc. 26 ¶¶ 72–84.) These Defendants move for summary judgment, asserting that they are entitled to qualified immunity. Because Defendants were performing discretionary functions, Plaintiff must prove that Defendants are not entitled to qualified immunity. *See Warden Okeechobee Corr. Inst.*, 762 F. App'x at 914–915. To do so, Plaintiff must prove the three elements of a deliberate indifference claim and also that the law was clearly established. *See id.* at 915; *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). Plaintiff cannot shoulder either burden.

### 1. Villegas Suffered a Serious Medical Need and Defendants' Actions Caused His Injuries

The first element of a deliberate indifference claim is a medical need that poses "substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), and is obvious enough that "even a lay person" recognizes a need for treatment, *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019). The third element is causation. A plaintiff must establish that the defendant's wrongful actions caused the inmate's injury. *See Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). Defendants contest neither element. Nor have they objected to the Magistrate Judge's conclusions that Villegas had a serious medical need and that Defendants' decision to wait to assess Villegas or provide him

36

medical care caused or contributed to his death. Accordingly, Plaintiff satisfies the first and third elements. Like many cases, the debate arises concerning the deliberate indifference element.

### 2. Subjective Deliberate Indifference

The second element requires Plaintiff to prove that Defendants were deliberately indifferent to Villegas's serious medical need. A defendant is deliberately indifferent when he (1) has subjective knowledge of a risk of serious harm; (2) disregards that risk, and (3) acts with "more than gross negligence." *Patel*, 969 F.3d at 1188 (quoting *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010)). Stated otherwise, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The Eleventh Circuit has routinely underscored that this standard "is far more onerous than normal tort-based standards of conduct sounding in negligence, and is in fact akin to subjective recklessness as used in the criminal law." *Hoffer*, 973 F.3d at 1271 (quotations omitted); *see also Patel*, 969 F.3d at 1188 n.10 (defendant's response must be so inadequate that it may "fairly be characterized as reckless") (emphasis omitted). For cases such as these involving medical treatment, the conduct must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hoffer*, 973 F.3d at 1271.

### i.   Subjective Knowledge

Plaintiff must first point to evidence establishing that Defendants were aware of Villegas's risk of serious harm. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). To do so in the absence of an admission, Plaintiff must identify enough circumstantial evidence to allow a reasonable jury to infer that Defendants were aware of the relevant risk. *See Campbell*, 169 F.3d at 1364. One avenue for doing so is to show that "the risk was obvious." *Farmer*, 511 U.S. at 842.

Taking the facts in the light most favorable to Plaintiff, there is sufficient evidence for a reasonable jury to find that Defendants knew Villegas was in some medical distress once he was in the wheelchair or immediately before. First, Villegas vomited in the wheelchair. (Doc. 56-1 at 28); *see Johnson v. Bessemer*, 741 F. App'x 694, 701 (11th Cir. 2018) (per curiam) (explaining that vomiting is a sign of a deteriorating condition or a drug overdose). Second, Villegas was motionless enough that at least one Defendant concluded he had passed out, and another thought keeping a hand on Villegas's shoulder might be needed to prevent him from falling over. (Doc. 56-1 at 29, 40; Doc. 57-1 at 43–44.) The videos confirm that Villegas was (at least mostly) motionless and did not raise his head. Third, Villegas's breathing was labored. (Doc. 52-1 at 88, 90.) And fourth, Defendants knew or suspected Villegas was under the influence of drugs, possibly K2, if only based on his erratic behavior during the struggle to restrain him, (Doc. 52-1 at 241), and the burning

odor in his cell, (Doc. 50-1 at 26). Although Villegas's face does not appear on the video recordings until he enters the treatment room, Defendants thought that Villegas's coloring was normal. (Doc. 59-1 at 106, 110; Doc. 49-2 at 19, 109.) Defendants also heard Villegas grunting when McBride replaced the spit shield.[14] (Doc. 56-1 at 134–35.)

Plaintiff argues there is a dispute as to whether Defendants perceived that Villegas was breathing. That is incorrect. Six Defendants recall seeing or hearing Villegas breathing in E-dorm or on the way to F-dorm. (Doc. 56-1 at 29–30; Doc. 59-1 at 57; Doc. 49-2 at 57; Doc. 52-1 at 83–85; Doc. 47-5 at 77, 86; Doc. 50-1 at 80.) Defendants disagree, however, on whether Villegas's breathing was concerning. For example, Ake and Fender testified that Villegas's breathing was heavy, like "being out of breath from fighting." (Doc. 49-2 at 66–67; Doc. 50-1 at 80.) In contrast, Gass described Villegas's breathing as concerning. (Doc. 52-1 at 88, 90.) Because there is a dispute on this point, the Court adopts the latter description as more favorable to Plaintiff.

Plaintiff would go further, asserting that there is a dispute on whether Defendants saw Villegas breathing at all. Plaintiff's expert Dr. Lavezzi opines that Defendants could not have seen Villegas breathing unless it was "labored." (Doc. 54-1 at 60.) This does not create a dispute of fact for at least three reasons. First, the opinion is likely inadmissible at

---

[14] Two officers recall hearing Villegas speak about not wanting Defendants to apply the second spit shield. (Doc. 57-1 at 54; Doc. 50-1 at 72–73, 76.) However, Foster's testimony that Villegas was "passed out" contradicts this. (Doc. 56-1 at 109.) That said, Foster admits that Villegas grunted. (Doc. 56-1 at 135–36.)

trial. Courts regularly exclude expert opinions on the reliability of eyewitness testimony. *See, e.g., United States v. Smith*, 122 F.3d 1355, 1358 (11th Cir. 1997) (excluding expert testimony as not helpful to the jury in making a credibility determination); *Clemons v. Knight*, No. 8:14-cv-1376, 2015 WL 7430032, at *8 (M.D. Fla. Nov. 20, 2015) (Whittemore, J.) (reasoning that expert opinion did not create a dispute of material fact as to what officer perceived), *aff'd*, 662 F. App'x 725 (11th Cir. 2016). At summary judgment, "court[s] may consider only that evidence that would be admissible at trial." *White v. Wells Fargo Guard Servs.*, 908 F. Supp. 1570, 1577 (M.D. Ala. 1995) (De Ment, J.) (citations omitted); *accord Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). So Lavezzi could testify based on her experience and qualifications whether shallow breathing is hard to perceive (she testified it "would be extremely difficult to assess any kind of shallow breathing," (Doc. 54-1 at 60)), but she cannot offer an opinion about the veracity of what the Defendants' testified that they observed.

Second, even if admissible, it is not ripe for resolution at summary judgment. After reviewing the videos, Lavezzi concludes that she cannot offer an opinion on when Villegas stopped breathing.[15] (*Id.* at 59.) Accordingly, Lavezzi's comment that Defendants could not have seen what they claim is solely a credibility or weight of the evidence consideration.

---

[15] The videos are also inconclusive. After reviewing the videos, Aubrey Land, another of Plaintiff's experts, concurs with Lavezzi, saying that he "can't say if [Villegas] was breathing or not breathing." (Doc. 75-1 at 74.)

And this Court cannot consider credibility at summary judgment. *See Anderson*, 477 U.S. at 255.

Finally, even if Lavezzi's opinion could create a dispute of fact, it would not do so here because it excludes the type of breathing Defendants noticed. Lavezzi explains that, based on her experience, a lay person usually cannot detect if someone else is breathing. (Doc. 54-1 at 60.) However, she allows that it *is* possible to see breathing if it is "labored breathing" or "very big breathing." (*Id.*) Here, Gass, Ake, and Fender's description of Villegas's breathing fits in Lavezzi's categories of labored or heavy breathing.[16] (Doc. 52-1 at 88–92; Doc. 49-2 at 66–67; Doc. 50-1 at 80.) Accordingly, the undisputed evidence is that, at least some, Defendants saw labored breathing from Villegas at various points after the struggle in E-dorm, when Villegas was in the wheelchair, and while he was on the way to F-dorm.

In sum, Plaintiff met its burden to show Defendants were aware of a serious medical need when they decided to take him to F-dorm. Specifically, a jury could conclude that Defendants knew Villegas had vomited recently, had passed out, and had labored

---

[16] Gass uses the word "shallow," but he clarified that he was referring to a type of breathing that he thought would be "pretty normal for anybody that's been involved in a use of force." (Doc. 52-1 at 163.) He analogized to the other Defendants in the video, saying "[y]ou see the rest of us having shallow breaths from fighting the inmate." (*Id.*) While not a standard definition, Gass is describing labored or heavy breathing when he uses the word "shallow." (*Id.*)

breathing. They knew that Villegas had struggled with them for over twenty minutes and knew or suspected that Villegas was under the influence of some drug, possibly K2.

### ii. Disregard That is More Than Gross Negligence

In addition to proving that Villegas had a serious medical need and that Defendants were aware of that need, Plaintiff must also show that Defendants disregarded it in a fashion that was more than grossly negligent. Plaintiff has not made that showing.

A defendant violates the Eighth Amendment when his actions are "so objectively inadequate" as to be "'an unnecessary and wanton infliction' of physical suffering." *Taylor v. Adams*, 221 F.3d 1254, 1259–60 (11th Cir. 2000) (quoting *Estelle*, 429 U.S. at 105). This "is not a constitutionalized version of common-law negligence" *Swain v. Junior*, 961 F.3d 1276, 1287–88 (11th Cir. 2020) (emphasis omitted). Instead, a defendant is deliberately indifferent when his response "is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quotation omitted). This standard "is far more onerous than normal tort-based standards of conduct sounding in negligence,' and is in fact akin to 'subjective recklessness as used in the criminal law.'" *Swain*, 961 F.3d at 1287–88 (quotations omitted).

Plaintiff bases the deliberate indifference claim on Defendants' decision not to check Villegas's pulse or provide care in E-dorm and to transport him to F-dorm for medical

42

care. Plaintiff argues that this decision was worse than gross negligence because it amounted to inaction in response to Villegas's serious medical needs. Even if a jury could conclude Villegas was unconscious, Plaintiff's characterization of "no treatment at all" fails to fairly assess Defendants' conduct and a reasonable jury could not agree it "shocked the conscience" to promptly bring Villegas to the treatment center instead of provide aid in the common area.

The decision to take an inmate to a second location for medical care is itself medical care. *See Taylor*, 221 F.3d at 1259; *Hoffer*, 973 F.3d at 1272 (distinguishing between denying medical care and a course of treatment that entailed delay); *cf. Bozeman*, 422 F.3d at 1272–74 (finding decision to take inmate to a second holding cell where no medical personnel were present was inaction and a denial of care). This is true even when care could have been provided at the scene. *See Taylor*, 221 F.3d at 1259 (holding that a nurse's decision not to assess a detainee at the scene, but rather to send him to a distant hospital was not "so objectively inadequate" as to be deliberate indifference). Accordingly, Defendants' decision to take Villegas to the medical treatment room in F-dorm was a form of medical treatment.

Since Defendants did not ignore Villegas's need for medical attention but selected a course of treatment, the proper inquiry is whether their response was so inadequate that it nevertheless constituted deliberate indifference. The "Eighth Amendment doesn't

43

require [the medical care provided] to be 'perfect, the best obtainable, or even very good.'" *Hoffer*, 973 F.3d at 1271 (quoting *Harris*, 941 F.2d at 1510). Instead, the question is whether their decision to take Villegas directly to F-dorm rather than provide assessment or treatment at the scene was so inadequate as to be worse than gross negligence. *See Taylor*, 221 F.3d at 1259. Plaintiff has not made this showing.

For purposes of determining whether Defendants' response was constitutionally inadequate, the Court must assume (consistent with the above analysis drawing all permissible inferences in Plaintiff's favor on the first element) that Defendants knew Villegas had vomited recently, had passed out, and had labored breathing when they put him in the wheelchair. The undisputed facts that must also be considered include that they noticed Villegas was breathing at multiple points after they lifted Villegas into the wheelchair and before his arrival to F-dorm. They also saw that Villegas's coloring was normal and heard him grunt when they replaced the spit shield. His erratic behavior and the smell in the cell gave them reason to infer that Villegas was on drugs. Finally, they knew that Villegas struggled with them for twenty minutes and that as many as seven officers had restrained him using their body weight.[17]

---

[17] The Magistrate Judge likens this case to *Walton. See Walton v. Fla. Dep't of Corr.*, No. 3:16-cv-1130, 2020 WL 5255088 (M.D. Fla. Sept. 3, 2020) (Davis, J.). The Court respectfully disagrees. In *Walton*, Defendants decided to transport an inmate by a wheelchair, instead of a stretcher, despite observing that the inmate was not moving, his mouth was open, and his "head [was] hanging back unnaturally." *Id.* at *11. The evidence supported that the inmate's neck and head injuries were so obvious that moving him in "such manner" revealed an attitude of deliberate indifference. In contrast and as detailed above, the signals available to Defendants were conflicting and not nearly so obvious.

Based on that information, Defendants had to make a "split-second, emergency choice between two options." *Taylor*, 221 F.3d at 1260. Should they assess Villegas in E-dorm, hoping the nurses were close by and had whatever might be required? Or should they take Villegas to the medical treatment room in F-dorm, which would incur a delay of some minutes (almost seven as it turned out), but where medical staff would presumably have all they needed to treat Villegas, including oxygen?

Gass—the officer in charge—chose the latter, deciding to move Villegas to the closest treatment room, which was a few hundred yards away. (Doc. 52-1 at 238; Doc. 52-7 at 80.) Gass explained that Villegas's breathing was concerning and that he suspected Villegas was on K2. (Doc. 52-1 at 88–90.) He reasoned that taking Villegas to F-dorm was superior to staying in E-dorm because the treatment room had oxygen and an IV with the medicines to treat a drug overdose. He also thought that the on-call doctor would reach the treatment room more rapidly than E-dorm. Finally, he thought that, given the erratic behavior of inmates on K2, it would be safer to assess Villegas in the treatment room. (*Id.* at 225–26.)

Perhaps that decision was wrong or even negligent. But it was not so inadequate as to "constitute 'an unnecessary and wanton infliction of pain.'" *Taylor*, 221 F.3d at 1258 (quotation omitted). Instead, it is a "classic example of a matter for medical judgment," and not a constitutional violation. *Rutledge v. Alabama*, 724 F. App'x 731, 736 (11th Cir. 2018)

(per curiam) (quoting *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (explaining that whether defendants "should have employed additional diagnostic techniques or forms of treatment" is a medical judgment that is "not an appropriate basis for grounding liability under the Eighth Amendment")).

Of course, taking Villegas to F-dorm delayed care for close to seven minutes. "A defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). When evaluating a delay in medical care, courts consider the nature of the medical need and the reason for the delay. *See Warden Okeechobee Corr. Inst.*, 762 F. App'x at 918. Here, the delay, which was short and was supported by multiple reasons, did not rise to the level of deliberate indifference.

First, the delay lasted, at most, seven minutes. And the delay from the transport to F-dorm itself was less than six minutes. Of course, a seven-minute delay to someone in Villegas's condition was a serious matter. *See Bozeman*, 422 F.3d at 1273. If a medical professional made the call, it might have been malpractice. But Defendants' decision (one by correctional officers, not medical personnel) on the best place to administer care did not amount to criminal recklessness. *See Taylor*, 221 F.3d at 1258 (explaining that "negligence in diagnosis or treatment" and medical malpractice are insufficient to support a deliberate

indifference claim (alterations omitted)). Instead, it was a decision on which persons could disagree. For example, Spencer thought Villegas should have been taken to "medical," a yet more distant location in the prison that had more equipment and space than the treatment room in F-dorm. (Doc. 51-5 at 91.) She thought the additional delay (likely a few minutes) would have been worth it. (*Id.* at 91–92.) In contrast, Fischer and Plaintiff's experts believed Villegas should have been treated on the scene. This legitimate difference of opinion confirms that Defendants' conduct does not amount to such severe negligence that it "shock[s] the conscience" or is "intolerable to fundamental fairness." *Hoffer*, 973 F.3d at 1271; *see Harris*, 941 F.2d at 1505 (explaining that a "difference in medical opinion" on treatment is not deliberate indifference).

Second, Defendants had sound reasons for the delay. *See Bozeman*, 422 F.3d at 1273 (explaining that "the right reason for the delay can make a delay of any duration tolerable"); *see also Hoffer*, 973 F.3d at 1274 n.5 (explaining that medical and non-medical reasons are relevant). As explained above, Gass and others thought that the treatment room was the best place to assess Villegas and give treatment. They reasoned that the treatment room was well-equipped, having all the medical supplies and medical staff Villegas might need. (Doc. 57-1 at 99; Doc. 52-1 at 225–26); *cf. Davies v. Israel*, 342 F. Supp. 3d 1302, 1306–08 (S.D. Fla. 2018) (Moore, C.J.) (reasoning that refusing to transfer a detainee to

47

a hospital and making him wait—unconscious and bleeding—for seven hours supported a claim for deliberate indifference because defendants had "no apparent medical reason").

Defendants also point to safety concerns. Even though Villegas appeared calm, Defendants thought he might "just [be] acting." (Doc. 47-1 at 39, 54.) Or—as happened at the beginning of the encounter—Villegas might quickly transition from apparent unresponsiveness to combativeness. Such behavior was not unusual for inmates on K2 or other synthetic drugs. (Doc. 52-1 at 88–90, 225–26.) As Perrotta explained, the officers had to consider the threat to themselves and medical staff from the "fact that [Villegas] was just resisting and attempting to assault staff [for] 20 minutes." (Doc. 47-1 at 41).This concern was particularly relevant since, "right before then[, Villegas] was just trying to bite another officer." (*Id.* at 38.) Since "an inmate can go from being uncombative right back to being combative again," Defendants "wanted to take him out of that situation and move him" to F-dorm. (*Id.* at 54.) They believed the treatment room was a better place to give treatment because it was "a safer, secured area" where officers could "control the inmate." (Doc. 57-1 at 101.) It was also near to holding cells where the officers could place Villegas if he became combative again. (Doc. 51-5 at 98.)

Defendants cite procedure and precedent as another reason for the transport. It was standard practice to take an inmate to a medical treatment room after a use of force

incident.[18] (Doc. 57-1 at 91, 98–101; Doc. 59-1 at 29–30, 99, 119; Doc. 50-1 at 64; Doc. 49-1 at 47; Doc. 47-1 at 128; Doc. 47-5 at 34; Doc. 48-2 at 12, 37; Doc. 52-1 at 26; Doc. 56-1 at 50.) Nurse Spencer explained that, "[f]or safety reasons," officers usually did not allow nurses to approach an inmate until he reached a designated treatment location. (Doc. 51-5 at 40.) Even if "compliance [with that procedure] was medically unreasonable" here, the fact that Defendants followed the usual procedure "militates against concluding that [their] actions were wanton." *Taylor*, 221 F.3d at 1260 (taking detainee to hospital rather than assessing his condition onsite was not deliberate indifference).

Finally, Defendants cite their responsibilities to protect inmate confidentiality under the Health Insurance Portability and Accountability Act (HIPAA). They reasoned that providing medical treatment in E-dorm could violate Villegas's rights to privacy if immediate treatment was not truly necessary.[19] Seeing Villegas breathing, they concluded that it was not. (Doc. 47-1 at 57.) As Defendants explain, treatment was usually provided in a treatment room to avoid HIPAA issues from unnecessary revelation of an inmate's medical condition or information. In contrast, approximately fifty inmates could have observed any medical care Villegas received in E-dorm. (Doc. 50-1 at 66; Doc. 47-1 at 56.)

---

[18] Gass, the officer in charge who made the decision to take Villegas directly to F-dorm, recognized that an exception would apply in medical emergencies. (Doc. 52-1 at 179.) But Defendants believed that, since Villegas was breathing and had normal coloring, his medical need was not so dire as to require medical assessment at the scene. (*Id.* at 177–80; Doc. 59-1 at 55–56; Doc. 65-1 at 71.)

[19] Defendants are uniform on this point. (Doc. 47-1 at 56; Doc. 47-5 at 34; Doc. 50-1 at 63–65; Doc. 52-1 at 26; Doc. 53-7 at 31–34; Doc. 56-1 at 85; Doc. 57-1 at 85, 90, 99; Doc. 59-1 at 55.)

These are all permissible reasons that (even if mistaken) provide Defendants grounds to delay medical care while they moved Villegas to a treatment room. *See Whitley*, 475 U.S. at 319 (explaining that "error in good faith" does not "characterize the conduct prohibited by the [Eighth Amendment]"); *cf. Bozeman*, 422 F.3d at 1273 (inferring deliberate indifference because defendants offered "no explanation" for the delay). Considered in the light of these reasons, the Court concludes that the delay did not amount to deliberate indifference.

Plaintiff disagrees, arguing that the FDOC's use of force policy informed Defendants that Villegas was in serious medical distress and that the appropriate response was immediate medical care. (Doc. 73 at 42–43.) The policy says appropriate medical care shall be provided "immediately" after a use of force. (Doc. 75-6 at 15.) Plaintiff argues that this language required Defendants to assess Villegas and give medical care in E-dorm and that they failed to do so. If Plaintiff means to suggest that Defendants intentionally violated the use of force policy, thereby showing their deliberate disregard to Villegas's wellbeing, he is mistaken.

As an initial matter, it is far from clear that the word "immediately" requires medical treatment in E-dorm. So too, the policy requires only "[a]ppropriate" care, which gives officers discretion to evaluate the circumstances. Accordingly, there is room to debate whether Defendants' course of action complied with the policy. For example, Smith

thought taking an inmate to receive medical care "as soon as the use of force was done" complied with the directive to give "immediate" medical attention. (Doc. 57-1 at 84–85.) In contrast, Disano acknowledged that taking an inmate to a second location for treatment was not "immediate." (Doc. 48-2 at 102.) Regardless, it is undisputed that the use of force policy was routinely interpreted to allow transport to a second location for medical care, as this sequence was the almost exclusive practice after a use of force event.[20]

Since the policy is subject to multiple interpretations and the dominant practice was not to provide care onsite, this argument fails. Even if Defendants incorrectly interpreted the policy, their decision to follow dominant practice (and thus violate the policy) does not necessarily manifest "an attitude of 'deliberate indifference' to [Villegas's] serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Farmer*, 511 U.S. at 834). At most, it shows they decided between following a dominant custom of taking the inmate to a treatment room or following a written policy of onsite care. They had to make that decision in the context of all the circumstances of the Villegas incident. Such a split-second choice between alternatives is not evidence of deliberate indifference when the choice made itself does not constitute gross incompetence so as to shock the conscience.

---

[20] For example, Defendants Foster, Smith, Fender, Lee, Ake, Perrotta, McBride, Amrit, Disano, and Gass thought that taking inmates to the nearest medical treatment room was standard procedure after a use of force incident. (Doc. 56-1 at 50, 66, 85–86; Doc. 57-1 at 91, 98–101; Doc. 59-1 at 29, 119; Doc. 50-1 at 64; Doc. 49-1 at 47; Doc. 47-1 at 128–29; Doc. 47-5 at 34; Doc. 48-2 at 12, 37, 100; Doc. 53-7 at 33; Doc. 52-1 at 26, 176–79.)

Even if it violated policy, that alone would not be enough to show deliberate indifference. A "failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence." *Taylor*, 221 F.3d at 1259. For example, in *Taylor*, defendants were paramedics whose procedures required them to check the vital signs of any person who they believed was suffering from a seizure. A bystander told the paramedics that a detainee had a history of seizures and that he had observed signs that the detainee was having a seizure. The Eleventh Circuit explained that, even if the paramedics knew that the detainee was having a seizure, their failure to check his vital signs—as required by procedure—was only negligence. *Id.* So too here. Even if Defendants knew that the use of force policy required them to immediately assess Villegas in E-dorm because of his serious medical need, their failure to follow procedure alone is but negligence.

In sum, Plaintiff has not established that Defendants' decision to take Villegas to F-dorm for treatment was so inadequate as to "constitute 'an unnecessary and wanton infliction of pain.'" *Id.* at 1258 (quotation omitted). Instead, viewing the evidence in the light most favorable to Plaintiff, Defendants' conduct was, at most, "merely accidental inadequacy, 'negligence in diagnosis or treatment,' or [possibly] 'medical malpractice,'" none of which are sufficient to support Eighth Amendment deliberate indifference. *Id.*

(quotations and alterations omitted). Defendants are entitled to summary judgment on Count III.

### 3. Qualified Immunity

Qualified immunity bars damages actions against government officials performing discretionary functions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 813–15, 818 (1982). To overcome a claim of qualified immunity when the officials were acting within their discretionary authority, a plaintiff must show that the defendant violated a constitutional right, and that this right was "clearly established" at the time. *See Patel*, 969 F.3d at 1181 (quoting *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014)); *Crocker v. Beatty*, 995 F.3d 1232, 1239–40 (11th Cir. 2021). The "salient question is whether the state of the law gave the defendants fair warning that their alleged conduct was unconstitutional." *Caldwell*, 748 F.3d at 1102 (quotation and alteration omitted).

As explained above, Plaintiff does not prove that Defendants violated Villegas's rights by acting with deliberate indifference to his medical needs. This failure entitles Defendants to qualified immunity. *See Crocker*, 995 F.3d at 1240. But even if Plaintiff had made a sufficient showing, Plaintiff has not proven that the law was clearly established.

Plaintiff makes two attempts. First, Plaintiff argues that a case with similar facts, *Bozeman v. Orum,* clearly established the law. (Doc. 73 at 39.) Second, Plaintiff argues

that the Eleventh Circuit in *Patel* recognized a general principle that governs the facts of this case. (*Id.* at 40.) Neither contention is correct.[21]

First, analogous caselaw may clearly establish a right. Specifically, precedent from the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court must have placed the constitutional question "beyond debate." *Patel*, 969 F.3d at 1186 (quoting *J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259–60 (11th Cir. 2018)). While cases need not be identical, the contours of the constitutional right must be clear. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Indeed, "so clear that, given the specific facts facing a particular officer, one must say that 'every reasonable official would have understood that what he is doing violates' the Constitutional right at issue." *Gates v. Khokhar*, 884 F.3d 1290, 1302 (11th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). That standard is especially difficult to satisfy in deliberate indifference cases, which "are highly fact-specific and involve an array of [pertinent] circumstances." *Bozeman*, 422 F.3d at 1274; *see al-Kidd*, 563 U.S. at 742 (requiring that "the violative nature of particular conduct [be] clearly established").

---

[21] A right is also clearly established if "the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *Patel*, 969 F.3d at 1186 (quotation omitted). The Court does not address this method because Plaintiff has not argued it.

Plaintiff points to *Bozeman v. Orum* as a case "involving similar facts." (Doc. 73 at 39.) However, *Bozeman* is not a "materially similar case."[22] *Patel*, 969 F.3d at 1186 (quoting *J W*, 904 F.3d at 1259). In *Bozeman*, "the officers knew [the inmate] was unconscious and not breathing and—for fourteen minutes—did nothing." *Bozeman*, 422 F.3d at 1274. They did not "check [the inmate's] condition, call for medical assistance, administer CPR or do anything else to help." *Id.* at 1273. Instead, the officers covered the inmate—who "appeared to be lifeless"—with a blanket. *Id.* at 1269. They then carried him in a "face-down position," with two officers holding him by his "blue and swollen" ankles. *Id.* Then, traveling by an indirect and unnecessarily long route—with one officer swearing all the while—the officers carried the inmate to a second holding cell. *Id.* at 1269 & n.6, 1270 & n.7, 1273. Once there, they called for a nurse. *Id.* at 1270. The court concluded that, under these circumstances, the officers had totally failed to "address [the inmate's] medical need." *Id.* at 1274.

Four key facts distinguish this case from *Bozeman*. First, in *Bozeman*, the officers delayed fourteen minutes. The delay here was seven minutes—half as long. *See id.* at 1273

---

[22] At the motion to dismiss stage when Defendants argued that Plaintiff failed to state a claim of deliberate indifference, the Court noted that the complaint's allegations were "similar" to the facts of *Bozeman*. *See Stalley v. Cumbie*, No. 5:19-cv-280, 2019 WL 13037191, at *5 (M.D. Fla. Sept. 13, 2019) (Moody, J.). It thus denied the motion because Plaintiff plausibly stated a claim based on the factual allegations, including that Defendants "refused to let the nurses provide medical assistance to Villegas" and "depriv[ed] him of medical assistance for an additional 30 minutes." *Id.* The Court did not decide—because it did not have an occasion to—that *Bozeman* was clearly established law foreclosing qualified immunity. Further, now with discovery instead of allegations, the extensive record the parties compiled reveals significant differences that demand a different result at summary judgment on the issue of qualified immunity.

(holding that "a delay of fourteen minutes is actionable" and emphasizing that delay must be measured in minutes). Second, in *Bozeman*, the officers knew the inmate was not breathing and was unconscious. *See id.* at 1274 (stressing the importance of the "kind of notice imputed to a government official"). Here, Defendants observed Villegas breathing at several points within the seven-minute period before he received medical care in F-dorm. *See Johnson*, 741 F. App'x at 700 (distinguishing *Bozeman* because the detainee "was breathing every time [the defendant] checked on her"). And there is no evidence demonstrating when Villegas stopped breathing, unlike in *Bozeman*, where the circumstances were "stark and simple." *Bozeman*, 422 F.3d at 1274.

Third, in *Bozeman*, the officers completely failed to address the inmate's condition because they carried him to a second location that was unconnected with medical care. *See Bozeman*, 422 F.3d at 1270; *see also Davies*, 342 F. Supp. 3d at 1306–08 (refusing to move a bleeding and unconscious detainee to a hospital for seven hours without reason supported deliberate indifference claim). In contrast, Defendants here moved Villegas's to a nearby building where they expected Villegas would receive medical care—better care than they could provide absent the transport. *See Taylor*, 221 F.3d at 1259 (taking a detainee to a hospital, rather than assessing him at the scene, was not "sufficiently worse than negligent"). Accordingly, Defendants' response was not akin to the "total failure to address" the inmate's condition in *Bozeman*. 422 F.3d at 1274 (stressing the importance of "what

was done to help and when"). At most, Defendants here were "negligen[t] in diagnosis or treatment" of Villegas's situation. *Taylor*, 221 F.3d at 1258 (quotation and alterations omitted).

Fourth and finally, the defendants in *Bozeman* could point to no "medical or non-medical" reasons for their failure to act. *Bozeman*, 422 F.3d at 1273. Defendants here offered several reasons for their decision, such as prison procedure, safety, inmate privacy, and the superior availability of medical staff and equipment.

Given these material differences from *Bozeman*, "it would [not] be clear to a reasonable officer that the conduct was unlawful in the situation he confronted.'" *Saucier v. Katz*, 533 U.S. 194, 194–95 (2001); *see Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (requiring that the law be "established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant was doing would be clearly unlawful given the circumstances"). Thus, *Bozeman* is not sufficiently similar, and Plaintiff puts forward no other case.

Even without a case on point, a right is clearly established if the plaintiff identifies "a broader, clearly established principle" that governs the facts. *Patel*, 969 F.3d at 186 (quoting *J W*, 904 F.3d at 1259). This is a path "rarely-trod" that requires Plaintiff to show that the principle applies "with obvious clarity to the circumstances." *Crocker*, 995 F.3d at 1240. Even "[m]inor variations between cases may prove critical." *Youmans v. Gagnon*,

626 F.3d 557, 563 (11th Cir. 2010) (per curiam). Plaintiff cites *Patel* and *Bozeman* for the principle that a "prison official acts with deliberate indifference when the official fails to provide adequate medical treatment for a prisoner that has fallen unconscious." (Doc. 73 at 39–40 (emphasis omitted).) Plaintiff is incorrect. The principle from *Patel* and *Bozeman*, which Plaintiff misstates, does not apply to this case.

First, Plaintiff misstates the principle. *Bozeman* and *Patel* do not address inadequate medical care. Instead, *Patel* (which comes after and considers *Bozeman*), explains that its opinion "leave[s] open the question whether an officer who takes inadequate measures to treat a dangerous condition may be entitled to qualified immunity." *Patel*, 969 F.3d at 1191 n.11; *see also Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (instructing courts not to "define clearly established law at a high level of generality" (quoting *al-Kidd*, 563 U.S. at 742)).

Instead, the clearly established principle from these cases is that "complete abdication in the face of a known serious need is unconstitutional." *Patel*, 969 F.3d at 1191; *Bozeman*, 422 F.3d at 1274 (emphasizing that the officers "did nothing"). "This broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution." *Patel*, 969 F.3d at 1190. But this "general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical

58

treatment." *Bozeman*, 422 F.3d at 1274. So, a "complete abdication in the face of a known serious need" must be distinguished from provision of "inadequate aid" or a delay in aid. *Patel*, 969 F.3d at 1191. If a defendant's response is merely inadequate to the situation, then a plaintiff cannot rely on this principle, but must lean on caselaw that put a defendant "on notice that his response was deficient" in a constitutional sense. *Id.* at 1191 n.11. And Plaintiff has not identified cases with sufficiently analogous facts. So, all Plaintiff has is the principle from *Patel* and *Bozeman*.

And that principle does not govern here. The defendants in *Patel* and *Bozeman* were "confronted with a serious medical need and did *nothing*." *Id.* at 1191. Not so here. Observing Villegas's breathing and coloring, Defendants thought—incorrectly as it turned out—that Villegas was not in such imminent medical distress that immediate treatment was necessary. Defendants moved Villegas to a nearby building for medical care that they believed would be ready and ample upon their arrival. At most, their decision constituted "inadequate aid, the reasonableness of which can be fairly disputed." *Id.*; *see Whitley*, 475 U.S. at 319 (explaining that an "error in good faith" is not deliberate indifference). And while it had tragic consequences, the decision did not constitute a total failure to provide care or a complete abdication. *See Taylor*, 221 F.3d at 1259. Accordingly, Defendants' conduct does not fall within the principle of *Patel* and *Bozeman*.

All told, Plaintiff does not prove that it was clearly established that an official is deliberately indifferent to an inmate's medical need when he takes him to a nearby treatment room rather than giving care on the spot. *Bozeman*—the only case Plaintiff identifies as having analogous facts—is materially different. So too, Plaintiff misidentifies the principle from *Patel* and *Bozeman*, a principle that does not apply to this case. Thus, Plaintiff fails to establish that the law gave Defendants "fair warning" that their decision to take Villegas to a medical treatment room rather than provide assessment and care onsite violated the Constitution. *Caldwell*, 748 F.3d at 1102 (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1359 (11th Cir. 2003)). As such, Defendants are entitled to qualified immunity on Count III.

### 4.  Conclusion to Deliberate Indifference Claim

Plaintiff's claim for deliberate indifference in Count III fails. First, Plaintiff fails to prove that Defendants acted with more than gross negligence. And thus, Plaintiff cannot establish a constitutional violation. This is so even though the Court draws all permissible factual inferences in Plaintiff's favor and assumes that Defendants subjectively knew of Villegas's medical distress. In short, it was not deliberately indifferent under the circumstances for them to decide that the best place to treat Villegas was F-dorm. Of course, that decision may have been wrong or even negligent. It may have caused the tragic consequences. But it did not violate the Eighth Amendment. Second, Defendants are

60

entitled to qualified immunity on Count III because Plaintiff has not established that Defendants violated clearly established law. Therefore, the Court grants summary judgment to Defendants Gass, Key, Fender, Ake, Amrit, McBride, Smith, Tifft, Perrotta, and Foster on Count III.

### C. Supervisory Liability under 42 U.S.C. § 1983

In Count IV, Plaintiff alleges that Defendants Gass, Disano, Lee, and Mashburn are liable as supervisors under 42 U.S.C. § 1983 for the unconstitutional acts of their subordinates. (Doc. 26 ¶ 86.) Defendants respond that they are entitled to qualified immunity. (Doc. 61 at 39; Doc. 62 at 16.)

As the Magistrate Judge explained, Count IV contains three theories of liability. The first two theories relate to the Villegas incident and the Court treats them together. The third theory alleges that Defendants' failure to enact policies or otherwise train their staff on how to interact with inmates under the influence of K2 constituted deliberate indifference under the Eighth Amendment.[23]

---

[23] Because it contains three claims for relief, Count IV is a shotgun pleading. *See Bickerstaff Clay Prods. Co. v. Harris Cnty.*, 89 F.3d 1481, 1484 n.4 (11th Cir. 1996) (treating theories under 42 U.S.C. § 1983 as discrete claims for relief); *Cesnik v. Edgewood Baptist Church*, 88 F.3d 902, 905 (11th Cir. 1996) (reasoning that a complaint was a shotgun pleading because one count contained "at least nine discrete theories of relief"). As explained below, the three supervisory liability theories depend on separate sets of facts, violating Rule 10's prescription that a count should be "limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). But since the evils to be avoided by striking shotgun pleadings (lack of notice to parties and waste of judicial resources) are not present here, the Court analyzes the alternate theories of liability on their merits.

### 1. Supervisory Liability for Deliberate Indifference and Excessive Force in the Villegas Incident

Plaintiff alleges that Gass, Disano, Lee, and Mashburn are liable under § 1983 for violations of Villegas's constitutional rights. First, Plaintiff argues that these Defendants are liable for their personal participation or role as supervisors in the use of force incident. Second, Plaintiff argues that Defendants are liable because they employed a custom or practice that resulted in deliberate indifference to Villegas's serious medical needs. Neither theory succeeds.

"The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (quoting *Braddy v. Fla. Dep't of Labor & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)). A supervisor may be held liable under § 1983 if the plaintiff shows that the supervisor "either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047–48 (11th Cir. 2014) (citation omitted). One way to establish a casual connection is to show that a supervisor's custom or policy resulted in deliberate indifference to constitutional rights. *See Gonzales*, 325 F.3d at 1234–35 (citing *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)). "There can be no supervisory liability . . . if there was no underlying constitutional violation." *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008) (citation omitted).

"To establish a claim under § 1983 against an individual, a plaintiff must show that a person acting under color of state law deprived her of a federal right." *Bridges v. Poe*, 487 F. Supp. 3d 1250, 1257 (N.D. Ala. 2020) (citation omitted). As explained above, Plaintiff has not proved that any Defendant used excessive force or was deliberately indifferent to Villegas's medical needs. And "[a] supervisor may not be held liable under section 1983 unless the supervised official committed an underlying violation of a constitutional right." *Myers v. Bowman*, 713 F.3d 1319, 1328–29 (11th Cir. 2013) (citation omitted). Therefore, these Defendants could not have personally participated in a constitutional violation or otherwise have caused a violation of Villegas's rights. *See Keith*, 749 F.3d at 1047–48.

The same reasoning defeats Plaintiff's custom or practice claim. Plaintiff argues that Defendants employed a custom of denying immediate medical care after a use of force, which—Plaintiff submits—violated the FDOC rules for inmate care and constituted deliberate indifference. But since Plaintiff has not shown that Defendants were deliberately indifferent, he cannot show that Defendants established or condoned a custom that *caused* a constitutional violation. *See Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009) (reasoning that, "absent a violation of [the plaintiff's] constitutional rights" by an employee, the supervisors were entitled to summary judgment on plaintiff's custom or practice claim).

Further, speculation that the practice "might have *authorized* the use of constitutionally excessive force [or entailed deliberate indifference]" in another circumstance "is quite beside the point" if "a person has suffered no constitutional injury." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) (reasoning that policy of authorizing excessive force is not relevant when plaintiff was not deprived of a constitutional right); *see Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) (same).

"Without an underlying violation of [Villegas's] constitutional rights, [Defendants] cannot be liable in [their] individual or official capacity." *Gish*, 516 F.3d at 955. Accordingly, Defendants are entitled to summary judgment on Count IV because Plaintiff has not shown that their action or inaction as supervisors or participants resulted in a violation of constitutional rights.

Defendants are also entitled to qualified immunity on the custom or practice claim. As explained above, it is not clearly established that a delay in medical treatment for the purpose of moving a breathing inmate to a medical facility located within the prison compound is deliberate indifference. Accordingly, Defendants did not have fair warning that their practice constituted a denial of constitutional rights.

### 2. Failure to Train for Serious Medical Conditions Related to K2 Use

Next, Plaintiff alleges that Gass, Disano, Lee, and Mashburn failed to train the officers under their command to properly interact with inmates under the influence of K2.

64

(Doc. 26 ¶¶ 88.) Defendants assert qualified immunity. The Magistrate Judge recommended granting Defendants' motions for summary judgment because Plaintiff has not demonstrated that the law clearly required "special training" for K2. (Doc. 83 at 35–36.) Plaintiff has not objected to this recommendation. After review, this Court agrees with the Magistrate Judge and adopts the recommendation on this point.

As the Magistrate Judge explained, "Plaintiff cites not a single case demonstrating that the state of the law at the time of this incident gave Defendants fair warning that their training program was deficient to the point of [unconstitutionality]." (*Id.* at 35); *see West v. Tillman*, 496 F.3d 1321, 1330 (11th Cir. 2007) (holding that that the absence of a formal training program is not always "*constitutionally* inadequate"). Because Plaintiff has not met his burden to prove the law was clearly established, Defendants are entitled to qualified immunity and summary judgment on the failure to train theory.

### D. Negligence Claim Under Florida's Wrongful Death Act

In Count I, Plaintiff alleges that FDOC and Warden Cumbie are liable in negligence for their subordinates' failure to provide Villegas with prompt medical care. (Doc. 26 ¶ 53.) This claim arises under Florida's wrongful death statute, section 768.19, Florida Statutes. Because the Court is granting summary judgment on the federal claims that give rise to its jurisdiction, the Court declines to exercise supplemental jurisdiction over this state law claim.

Defendants removed this action from state court. (Doc. 1 at 3.) The Court had subject matter jurisdiction because the Complaint contained claims under § 1983 for violation of constitutional rights. *See* 28 U.S.C. § 1331. Because the state-law wrongful death claim relied on the same facts as the federal claims, the Court could exercise supplemental jurisdiction under 28 U.S.C. § 1367.

Now that the Court is granting summary judgment on the federal claims, however, the only remaining claim is one of state law. In the ordinary course, where the federal claims have been dismissed and the case is before a federal district court solely through supplemental jurisdiction, a court should decline supplemental jurisdiction. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Before applying that general rule courts engage in a two-step process: first, the district court must confirm that it has discretion to decline under § 1367(c); and second, it must consider whether prudential factors counsel against dismissal or remand.[24]

This Court has discretion to decline supplemental jurisdiction because it "has dismissed all claims over which it [had] original jurisdiction." § 1367(c); *see Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006) ("Any one of the section 1367(c) factors is sufficient to give the district court discretion to dismiss a case's

---

[24] Since this case originated in state court, the Court must remand, rather than dismiss, the state claim "over which [it] decline[s] to exercise supplemental jurisdiction." *McDuffie v. Broward Cnty.*, 654 F. App'x 408, 411 (11th Cir. 2016) (per curiam) (citation omitted).

supplemental state law claims.").[25] Because the Court has granted summary judgment for Defendants on Plaintiff's only federal claims, § 1367 authorizes the Court to decline supplemental jurisdiction.

Since § 1367 gives the Court discretion, the Court must consider whether "judicial economy, convenience, fairness, and comity" counsel against remanding the remaining state claim back to state court. *Ameritox, Ltd. v. Millennium Lab'y, Inc.*, 803 F.3d 518, 537 (11th Cir. 2015) (quotation omitted); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). And although not automatic, "in the usual case," once a district court has disposed of the federal claims, "the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7.

As "in the usual case," *id.*, the factors here weigh in favor of the Court declining supplemental jurisdiction. First, judicial economy would be assisted by declining jurisdiction. Although the Court has overseen pretrial litigation and extensive discovery, it has not ruled on the merits of Plaintiff's state claim. Accordingly, no duplicative orders would result from remand and this Court has not expended unnecessary resources that will be repeated in state court. Rather, the remaining state claim can quickly be presented for adjudication there. *See Jacoboni v. KPMG LLP*, 314 F. Supp. 2d 1172, 1181 (M.D. Fla.

---

[25] Although § 1367 uses the term "dismiss," the condition is satisfied by an order granting summary judgment. *See Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005).

2004) (Conway, J.) (noting that the case "could be set for trial in state court immediately after the pleadings close; this would not present a lengthy delay"). Since only state-law claims remain, "considerations of practicality and comity counsel that a state judge is best equipped to adjudicate those claims." *Id.* at 1180–81.

Second, convenience to the parties favors declining jurisdiction. Plaintiff filed this case in the Fifth Judicial Circuit in Lake County, Florida. Besides being Plaintiff's chosen forum, Lake County contains Lake Correctional Institution, the site of the events in this case. Meanwhile, the federal courthouse in Ocala is more than fifty miles from Lake Correctional. Presumably, Lake County will be a more central—and thus convenient—location to gather the evidence, parties, attorneys, and witnesses for trial.

Third, a remand to state court is not unfair to the parties. Plaintiff affirmatively chose the Fifth Judicial Circuit to file this action. While Defendants opted to remove to federal court, the basis upon which they removed—the federal claims—no longer exists. Accordingly, Defendants do not have a right to continue in federal court. Even if the parties would prefer not to return to state court, the Court does not see how it would be unfair to require them to do so. Because the trial date in federal court was stayed in October 2021, the parties have not expended undue effort preparing for a trial in this forum. And since the case is ready for adjudication in state court, the parties will not suffer an extended delay.

The Court anticipates that what delay they do experience will provide time to decide how best to proceed now that only one claim remains.

And finally, comity with state courts weighs strongly in favor of declining supplemental jurisdiction. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726. "One such needless decision would occur when a court decides issues of state law after the federal claims are dismissed before trial; in that situation, 'the state claims should be dismissed as well.'" *Ameritox, Ltd.*, 803 F.3d at 531 (quoting *Gibbs*, 383 U.S. at 726).

In sum, the Court has discretion to decline supplemental jurisdiction and the factors counsel in favor of remanding Plaintiff's state law claim. Since "no federal claim survives summary judgment, the [C]ourt sees no reason why the other claim[] should not be [remanded]." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 app. A (11th Cir. 1999).

## IV.    CONCLUSION

Despite drawing all legitimate inferences in Plaintiff's favor, Plaintiff fails to prove that a reasonable jury could conclude that Defendants violated the Eight Amendment by using excessive force or by exhibiting deliberate indifference. Thus, Plaintiff cannot defeat Defendants' claims to judgment on the merits or to qualified immunity. Since Defendants

are entitled to summary judgment on the federal claims, the Court declines to exercise supplemental jurisdiction and remands the remaining state law claim to state court.

Accordingly, the following is **ORDERED:**

1.   Defendants' Objections to the Report and Recommendation (Doc. 87; Doc. 88) are **SUSTAINED**.

2.   The Report and Recommendation (Doc. 83) is **ADOPTED IN PART** as stated above.

3.   Defendants' Motions for Summary Judgment (Doc. 61; Doc. 62) are **GRANTED IN PART** and **DENIED IN PART**. The Court grants summary judgment on Counts II, III, and IV.

4.   The Clerk is directed to **ENTER** judgment in Defendants' favor on Counts II, III, and IV; to **REMAND** this action to the Circuit Court of the Fifth Judicial Circuit, in and for Lake County, Florida, and to transmit a certified copy of this order to the clerk of that court; to **TERMINATE** any pending motions and deadlines; and to **CLOSE** this case.

**ORDERED** in Ocala, Florida, on February 19, 2022.

Kathryn Kimball Mizelle
United States District Judge